PEOPLE v BUSHARD

Docket No. 90889. Argued December 9, 1992 (Calendar No. 6). Decided September 29, 1993.

Anna Marie Bushard was convicted by a jury in the Eaton Circuit Court, Charles W. Simon, Jr., J., of first-degree murder and conspiracy to commit murder in connection with the shooting death of her daughter's boyfriend. The Court of Appeals, CYNAR, P.J., and WEAVER and R. M. PAJTAS, JJ., reversed in an unpublished opinion per curiam (Docket No. 94498). Following retrial, the defendant again was convicted by a jury, Hudson E. Deming, J., of first-degree murder and conspiracy to commit first-degree murder. The Court of Appeals, CYNAR, P.J., and GILLIS and WEAVER, JJ., affirmed in an unpublished opinion per curiam (Docket No. 112817). The defendant appeals, asserting that the admission of the testimony of a cellmate regarding admission of guilt by the defendant violated her right to remain silent, that the trial court improperly limited the scope of the cross-examination of the prosecution's main witness, that a hearsay statement made by a conspirator several days after the murder to another conspirator was not in furtherance of the conspiracy and thus not admissible, and that her retrial subjected her to double jeopardy.

In opinions by Justice BOYLE, joined by Justice GRIFFIN, by Justice LEVIN, joined by Chief Justice CAVANAGH and Justice MALLETT, and by Justice BRICKLEY, joined by Justice RILEY, separate majorities of the Supreme Court held:

1. The cellmate's testimony regarding a nonverbal response by the defendant to an inquiry regarding her admission of guilt was not use of silence as substantive evidence of guilt contrary to the Fifth Amendment. Rather, it related part of a conversation in which the defendant actively took part, and, thus, was admissible.

2. Limitation of cross-examination of the prosecution's main witness regarding welfare fraud, while error, did not deny the defendant a fair trial or violate0her right to confrontation, and does not warrant reversal.

3. The hearsay statement by one conspirator to another

several days after the murder regarding details of the shooting was not preserved for review.

4. The defendant was not subjected to double jeopardy. While there was some ambiguity in the verdict form at the defendant's first trial, there is no doubt that the jury convicted her both of first-degree murder and of conspiracy to commit first-degree murder, not conspiracy to commit second-degree murder.

Affirmed.

Justice BOYLE, joined by Justice GRIFFIN, further stated that the defendant's conviction does not constitute a miscarriage of justice. Limitation of the impeachment of a witness with evidence that she committed welfare fraud was within the court's exercise of latitude in deciding whether particular evidence indicates partiality. The Confrontation Clause guaranties an opportunity for effective cross-examination, not cross-examination that is effective in the way and to the extent the defense might wish.

The trial court properly prevented cross-examination of a witness regarding a conspirator's prior statement about the reason the witness paid him. The question contained a hearsay assertion, and there was no showing that the witness was unavailable so as to bring it within the hearsay exception.

The admission of a hearsay statement by one conspirator to another conspirator regarding the killing was not error; the statement was made in the course and in furtherance of the conspiracy.

Justice LEVIN, joined by Chief Justice CAVANAGH and Justice MALLETT, further stated that because there is substantial evidence that the use made of evidence claimed by the prosecutor to be corroborative of a witness' testimony, omissions of the defendant's trial counsel, and rulings of the trial judge, might have deprived the defendant of her due process right to a fair trial and might have resulted in a miscarriage of justice, there should be a remand to the trial court for a hearing pursuant to *People v Ginther,* 390 Mich 436 (1973), while retaining jurisdiction to consider, in light of such findings as the trial judge might deem appropriate, whether to order a new trial.

Justice BRICKLEY, joined by Justice RILEY, further stated that because the defendant had a constitutional right to cross-examine the prosecution's witness regarding her truthfulness and credibility, failure to allow cross-examination regarding the witness' alleged welfare fraud infringed upon the defendant's right of confrontation. However, the failure was not decisive of the outcome of the trial.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Jeffrey L. Sauter,* Prosecuting Attorney, and *Melissa A. Coulter* and *William M. Worden,* Assistant Prosecuting Attorneys, for the people.

*Wilson, Lawler & Lett* (by *Steven T. Lett*) for the defendant.

BOYLE, J. Anna Bushard was convicted by a jury of conspiracy to commit first-degree murder, MCL 750.157a; MSA 28.354(1), and first-degree murder, MCL 750.316; MSA 28.548. The object of the conspiracy was the murder of Rodney Fancher, the live-in fiancé of the defendant's daughter, Cora. In a per curiam opinion, the Court of Appeals affirmed Bushard's convictions. Unpublished opinion, decided January 11, 1991 (Docket No. 112817). We granted leave to appeal, 440 Mich 889 (1992).

The defendant raises four issues: (1) whether the admission of testimony that defendant "shook her head" when asked by a cellmate if she realized she was admitting her guilt, was a violation of the defendant's Fifth Amendment right to remain silent; (2) whether cross-examination of the prosecutor's chief witness was improperly limited, contravening the defendant's right of confrontation; (3) whether a coconspirator's statement was admissible against the defendant; and, (4) whether the retrial of defendant violated the constitutional ban against double jeopardy. Because the defendant's conviction does not constitute a miscarriage of justice, MCL 769.26; MSA 28.1096, we affirm the decision of the Court of Appeals upholding the defendant's conviction of conspiracy to commit first-degree murder and first-degree murder.[1]

---

[1] No request has been made for the *Ginther* hearing suggested by the dissent, nor does defense counsel's well-presented brief at any

I

The defendant, Anna Bushard, was tried jointly with Tony Hill for first-degree murder and conspiracy to commit murder. Both were convicted. However, because of a trial court error, Bushard was granted a new trial. On retrial, the defendant was again convicted of first-degree murder and of conspiracy to commit first-degree murder.

Peggy Stevens' testimony was the primary evidence at trial. However, the trial was not simply a one-to-one credibility contest. Stevens testified that Anna Bushard had originated the idea that would lure the deceased from his home to the appointment with his murderer. Anna suggested that Rod Fancher should be told that they had posted a note at Don's Truck Stop saying that Rod was looking for work. Tony Hill was to call Rod and arrange to meet him on the pretext that he had seen such a note and wanted to hire him to unload a truck. She also testified that Anna had said that simply breaking Fancher's arms and legs would do no good, that he had to be shot, and that she would pay the $1000 fee for the killing in installments. Peggy testified that after the murder Anna gave her $100, and she, in turn, gave it to Hill.

Bushard's cellmate, Rhonda Howlett, reiterated her testimony that Anna Bushard told her that she had given money to Peggy to give to Tony and, corroborating Peggy's testimony, that the defendant said that "the way they planned it" the murder of Rod Fancher was supposed to occur on Wednesday, October 2, 1985, not on Thursday when it actually occurred. Cora Bushard's testimony established that Rod had received phone

point seek to reargue the facts or claim that defendant's conviction constituted a miscarriage of justice. *People v Ginther,* 390 Mich 436; 212 NW2d 922 (1973).

calls from a man who initially asked him to unload a truck on October 2, and then rescheduled the meeting for October 3. The jury was given an accomplice instruction, but it was entitled to conclude from Howlett's testimony that Anna Bushard could only have known about the failed October 2 attempt if she had been part of the conspiracy.

Evidence was also introduced through the interrogating detective that coconspirators Harold Stevens and Peggy Stevens, separately questioned, gave identical statements regarding Bushard's involvement.

Testimony of the deceased's mother, Mary Fancher, also corroborated Stevens' account of Anna's involvement and may have been critical in jury deliberations.[2] Mary Fancher testified that she asked Rod on Wednesday night (October 2) how the man who had called him knew he was looking for work and

> then Anna spoke up and said that she had written Rodney's name and phone number on a slip of paper and gave it to Peggy and Harold to take and put on Don's—at Don's Truck Stop on the bulletin board.

Police investigation corroborated Peggy's testimony that no note was ever posted at Don's Truck Stop. The jury was thus entitled to conclude that the fictional note was a ruse and that Anna's statement that the call had come in response to a note she had personally written and allegedly given to Peggy and Harold to post, confirmed her participation in the plot to kill Rod Fancher.

Defendant also acknowledged that she had given

[2] The jury asked for the rereading of Mary Fancher's and Peggy Stevens' testimony. Fancher's testimony was read, and the jury returned the verdict without a rereading of Stevens' testimony.

Harold $100, but said it was to repair her car. She denied having said she wrote a note to be posted at Don's Truck Stop. Defendant testified that her daughter Cora, Rod's girl friend, had asked her in September if she would post a note. However, the jury was also entitled to credit Cora Bushard's contrary testimony concerning the note. Cora testified that the defendant told her that Peggy posted a note at Don's Truck Stop. While Cora also stated that she did not recall when any discussion about a note occurred, she admitted that she probably did not know about it before *she* asked her mother on October 2, 1985, how the man who called Rod knew he was looking for work.

Two juries have now considered the credibility of evidence implicating Anna Bushard and resolved the credibility question adversely to the defendant. We find no basis to conclude that the conviction of Anna Bushard constitutes a miscarriage of justice.

II

A

The defendant first complains that the testimony of Rhonda Howlett, a cellmate, was a violation of her right to silence under the Fifth Amendment. Howlett testified that while in jail, Bushard discussed her role in the plan to murder Fancher and when another cellmate asked Bushard whether she realized she was admitting her guilt, Anna "just shook her head, didn't say anything else." We agree with Justice LEVIN[3] that Howlett's testimony was evidence of Bushard's nonverbal response to a question presented during a conversation with her cellmates that the defendant ac-

---

[3] *Post*, p 398.

tively took part in. Thus, the testimony was not admitted as a violation of the defendant's right to silence under the Fifth Amendment.

B

Although not raised at trial, the defendant complains that her constitutional right of confrontation was violated on retrial when the court refused to allow the defendant to cross-examine Peggy Stevens, the prosecutor's chief witness, regarding prior unprosecuted criminal activity.[4] The defense contends that cross-examination concerning the welfare application fraudulently filed in defendant's name would show Peggy Stevens' tendency to accuse her mother of criminal activity. It is also claimed that cross-examination of Peggy regarding prior statements made by codefendant Tony Hill, that he was paid $100 for his participation in the theft of a trailer and that the money had nothing to do with the murder of Rod Fancher, would assist the jury in assessing Stevens' credibility.[5]

Dealing with the assertions in inverse order, it

[4] At trial, the defendant argued that MCL 768.27; MSA 28.1050 allowed admission of the witness' prior acts to be inquired into where the motive or plan is material. As correctly noted by the trial court and the Court of Appeals, the statute is not applicable because it applies to defendants and does not provide for the admission of the proposed cross-examination of a nondefendant witness. On appeal, the defendant raises the constitutional right of confrontation and the witness credibility issues. Although an objection raised at trial is insufficient to preserve an appellate attack based on a different ground, if a significant constitutional question is raised and is decisive to the outcome of the case, appellate review is appropriate. *People v Catey,* 135 Mich App 714; 356 NW2d 241 (1984); *People v Banning,* 329 Mich 1; 44 NW2d 841 (1950).

[5] The trial court rejected the defendant's MCL 768.27; MSA 28.1050 argument as inapplicable because Peggy Stevens was a witness and not a defendant in the case. It also found that the activity did not involve acts similar to the charge of conspiracy to murder. The trial judge ruled that defense counsel could question Tony Hill regarding his prior inconsistent statement concerning the $100, if he were called to testify at the second trial.

is clear that the trial judge properly prevented cross-examination with respect to Tony Hill's statement regarding the reason for payment to him of $100. The question contained a hearsay assertion, and no showing of the witnesses' unavailability was made so as to bring it within the hearsay exception, MRE 804(b)(1).[6]

Second, although evidence of a false charge of welfare fraud generally may have been helpful to suggest Peggy Stevens' hostility toward her mother, limitation of impeachment in these circumstances did not violate defendant's right of confrontation. A trial court has wide latitude in deciding whether particular evidence indicates partiality. 1 McCormick, Evidence (4th ed), § 39, pp 134-135. Stated otherwise, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v Fensterer,* 474 US 15, 20; 106 S Ct 292; 88 L Ed 2d 15 (1985) (emphasis in original); *Delaware v Van Arsdall,* 475 US 673, 679; 106 S Ct 1431; 89 L Ed 2d 674 (1986).[7]

---

[6] In addition, as noted by the dissent, Stevens denied any knowledge or involvement in the trailer theft during the first trial. Counsel may have anticipated a ruling that he could not contradict her denial because it was a matter not related to bias, not proper impeachment, and not a specific instance of conduct resulting in a conviction of crime, MRE 608(b); *People v Falkner,* 389 Mich 682; 209 NW2d 193 (1973). Because the trial court pointed out that the defense could call Tony Hill to testify, we assume the decision not to raise the MRE 804(b)(1) issue was a strategic choice based on counsel's desire to avoid the possibility of admission of other portions of Hill's testimony at the former trial, which corroborated Hill's phone calls to defendant's home on October 2, 1985, and his conversation with a woman Hill acknowledged he assumed was Anna Bushard, MRE 106.

[7] Contrary to the dissent's suggestion, the test of evidentiary error is not whether the jury "might have found it more likely that Stevens would falsely implicate her mother . . . ." Where the error is not of constitutional dimension, the inquiry is whether the defendant's conviction constituted a miscarriage of justice. MCL 769.26; MSA

In *Davis v Alaska,* 415 US 308, 316; 94 S Ct
1105; 39 L Ed 2d 347 (1974), the Court found a
denial of confrontation where the trial court pre-
vented any exploration of a witness' "bias," result-
ing from the witness' status as a juvenile on
probation, for its bearing on the motivation for his
testimony incriminating the defendant. By con-
trast, in the instant case, the welfare incident had
been resolved without prosecution, and the defen-
dant fully explored the bias inherent in Peggy
Stevens' status as a fully immunized witness. Ste-
vens was extensively examined regarding the fact
that she had received complete immunity from
prosecution for her admitted involvement in the
conspiracy to murder in exchange for her testi-
mony implicating her mother. Although inquiry
into Stevens' prior conduct may have been helpful
in discrediting Peggy Stevens, the limitation com-
plained of did not deny the defendant a fair trial
or violate her right of confrontation.

C

The defense also claims the trial court commit-
ted error requiring reversal by admitting the hear-
say statement made by coconspirator, Tony Hill, to
Peggy Stevens that he told the victim that "this
was the way she [Anna] wanted it done." In a
pretrial motion, the defense challenged the admis-
sion of Hill's statement to Stevens because it
occurred after the murder and was thus not a
statement made "in furtherance" of the conspir-
acy, because any conspiracy had been completed at
that point.

28.1096. A properly preserved claim that the denial of cross-examina-
tion had wholly prevented exploration of Stevens' bias, which it
clearly did not, would be subject to the harmless error analysis
announced by the Court in *Chapman v California,* 386 US 18, 24; 87 S
Ct 824; 17 L Ed 2d 705 (1967); *Delaware v Van Arsdall, supra* at 684.

The trial court deferred ruling on the issue until the evidence was presented at trial. However, the record does not contain any renewal of that motion or of any objection by the defendant to the admission of the statement at trial. On appeal, the defendant contends that, despite counsel's failure to renew the objection during trial, the court committed error requiring reversal by admitting the statement because it was not made "in furtherance" of the conspiracy.

The conspiracy in this case consisted of an agreement between the Stevenses, the defendant, and Tony Hill that Hill would murder Rodney Fancher in exchange for $1000. The conspirators agreed that the money was to be paid in installments. Hill's possession of the motorcycle was a "down payment" for his participation in the murder. The statement at issue was spoken a few days after the October 2, 1985, murder at the first meeting between Peggy and Harold Stevens and Hill following the killing. According to Stevens, Hill told them that he suggested to Rod that they get out of the car and smoke some weed, that as he shot him he told Rod why, and that Hill left him in the ditch where he fell. Several weeks later, in late October or early November, responding to Hill's pressure for payment, Anna Bushard gave Stevens $100 to give to Hill as an installment payment. The conspirators were arrested in late December before any additional or final payment was made.

Assuming arguendo that this issue was preserved for review by this Court, MRE 801(d)(2)(E) provides in pertinent part that a statement is *not* hearsay if

> [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party

during the course and in furtherance of the conspiracy on independent proof of the conspiracy.

Thus, to qualify under the rule, the statement must be made "during the course" *and* "in furtherance" of the conspiracy. If either requirement is unmet, the statement must be excluded. See 2 McCormick, Evidence (4th ed), § 259, p 166.

To satisfy the "during the course" aspect of the exception, the conspiracy must be extant at the time the statement is made. The phrase relates to the temporal dimension of the conspiracy, which continues until the common enterprise has been fully completed, abandoned, or terminated. An arrest generally terminates the conspiracy, as does the success or failure of its objectives. *Krulewitch v United States,* 336 US 440; 69 S Ct 716; 93 L Ed 790 (1949); *People v Beller,* 294 Mich 464, 468; 293 NW 720 (1940). See also LaFave & Scott, Criminal Law (2d ed), § 6.5(e), pp 554-555.

However, as noted by Professor Perkins, a conspiracy to commit a crime is not necessarily ended by the fact that enough has been done to incur guilt of that offense, Perkins & Boyce, Criminal Law (3d ed), p 710. Thus, even after the primary object of the substantive crime is complete, the conspiracy may continue if its objectives contemplated the completion of financial or other arrangements. *People v Losey,* 98 Mich App 189, 199-200; 296 NW2d 601 (1980), rev'd on other grounds 413 Mich 346; 320 NW2d 49 (1982); *People v Scotts,* 80 Mich App 1, 5-6; 263 NW2d 272 (1977).

Where conspiracies involve murders for hire, courts have held that because an act connected with the main objective of the conspiracy is not completed, the conspiracy is still alive, *Losey, supra; Scotts, supra; State v White,* 168 Ariz 500; 815 P2d 869 (1991), cert den 502 US 1105; 112 S Ct

1199; 117 L Ed 2d 439 (1992); *State v Howard,* 324 NW2d 216 (Minn, 1982); *People v Saling,* 7 Cal 3d 844; 500 P2d 610 (1972); *United States v Kahan,* 572 F2d 923, 935 (CA 2, 1978), cert den 439 US 833 (1978). "So long as the defendant continued to pay, the agreement[8] remained in force." *Losey, supra* at 200.

It is clear that the agreement contemplated payment. Moreover, the fact that a payment was actually made indicates that as of that point, subsequent to the making of the statement, the conspirators regarded payment as part of their agreement. The objects of the conspiracy had not been completed or abandoned, and no arrests had been made when Hill made his remarks.

The second requirement, "in furtherance," has been construed broadly. "[S]tatements made by one conspirator to keep other conspirators informed about the progress of the scheme do satisfy the 'in furtherance' requirement." *United States v Gibbs,* 739 F2d 838, 845 (CA 3, 1984), cert den 469 US 1106 (1985). In *United States v Maldonado-Rivera,* 922 F2d 934, 958-959 (CA 2, 1990), the court defined statements in furtherance of a conspiracy:

> [M]ere "idle chatter" does not satisfy Rule 801(d)(2)(E). Rather, the statements must be such as to prompt the listener—who need not be a coconspirator—to respond in a way that promotes or facilitates the carrying out of a criminal activity. . . . [S]tatements between coconspirators that may be found to be in furtherance of the conspiracy include statements that provide reassurance, or seek

---

[8] Contrary to Justice LEVIN's observation, *post,* p 421, it is not necessary that there be a basis for a finding "in fact" that what was said was in furtherance of the conspiracy. "Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court . . . ." MRE 104. The court may look to the hearsay statement itself to determine admissibility.

to induce a coconspirator's assistance or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy. [Citations omitted.]

*People v Trilck,* 374 Mich 118; 132 NW2d 134 (1965), is not to the contrary. In *Trilck,* the Court held that statements made by one coconspirator after his arrest were not in furtherance of the conspiracy because they "were not made to advance the common objective and criminal purpose," or "these statements, rather than being in furtherance of the conspiracy, were in derogation of same." *Id.* at 128.

Hill's statement was made "in furtherance" of the conspiracy to murder. Reporting the details of the crime to Peggy and Harold Stevens, presumably insured that he would collect his remaining payments, one of the main objectives of the killing as far as Hill was concerned, and a part of the conspiratorial understanding of all four conspirators. Moreover, the trial court's

finding that a given statement was uttered by a coconspirator "in furtherance" of a conspiracy will not be disturbed on appeal unless it is clearly erroneous. Where there are two permissible views of the evidence, the court's choice between them cannot be deemed clearly erroneous. [*Maldonado-Rivera, supra* at 959. Citations omitted.]

In short, it may be generally said that statements made after the commission of the substantive crime that is the object of the conspiracy are neither "in the course" nor "in furtherance" of the conspiracy because the object of the conspiracy has been accomplished. Where, as here, however, the conspiracy is a murder for hire, the object is more than the commission of the substantive offense. Because the conspiracy embraces payment as "its

last term," *State v Cruz,* 137 Ariz 541, 547; 672
P2d 470 (1983), the conspiracy in this case was
ongoing at the time the statement was made.
Hill's statement, made after the murder but before
payment had been made, was thus "made in the
course of and in furtherance of the conspiracy."
*Nixon v State,* 533 So 2d 1078, 1091 (Miss, 1987),
cert den 490 US 1102 (1989).

D

Finally, the defendant complains that she has
been put twice in jeopardy because in the first
trial she was convicted of "conspiracy to commit
murder" and, on retrial, was convicted of "conspir-
acy to commit first-degree murder." We agree with
Justice LEVIN that although the jury's verdict
form may have been ambiguous, there is abso-
lutely no doubt that at the first trial the jury
convicted Bushard of first-degree murder at the
same time it convicted her of conspiracy to mur-
der. Thus, the first conviction of conspiracy to
commit murder logically pertained to the finding
of first-degree murder, not of second-degree mur-
der as defendant alleges. Therefore, no double
jeopardy violation occurred when, on retrial, the
defendant was charged with and convicted of con-
spiracy to commit first-degree murder.

III

There is no basis from which it affirmatively
appears that the conviction of Anna Bushard con-
stitutes a miscarriage of justice. Accordingly, we
affirm the judgment of the Court of Appeals.

GRIFFIN, J., concurred with BOYLE, J.

LEVIN, J. Anna Marie Bushard was convicted of
first-degree murder and conspiracy to commit first-

degree murder on the testimony of her daughter, Peggy Stevens.[1]

I agree with the majority that Bushard's constitutional rights to be protected from self-incrimination[2] and double jeopardy[3] were not violated.

---

[1] Anna Bushard was tried jointly with Tony Hill, the person who shot and killed Rodney Fancher, in May, 1986. They were both convicted of first-degree murder and conspiracy to commit first-degree murder. The Court of Appeals affirmed Hill's conviction. Bushard's conviction was reversed because the circuit judge refused to read back trial testimony to the jury. Unpublished per curiam opinion, decided May 3, 1988 (Docket Nos. 94496, 94498). Bushard was retried alone in August, 1988, and again was convicted of both charges.

[2] Rhonda Howlett, who, together with Katherine Wright, occupied the same cell as did Anna Bushard before the first trial, testified at the retrial concerning a conversation she, Wright, and Bushard had in January or February, 1986. Howlett said that, at the conclusion of the conversation, the following occurred:

And Kathy said, well, Anna, you're saying that you're guilty. And Anna says—she just shook her head, didn't say anything else.

Bushard contends that her constitutional right to be protected against self-incrimination was violated when Howlett testified concerning Bushard's "silence" in the face of Kathy Wright's "accusation." Bushard claims that tacit or adoptive admissions through silence are not admissible in a criminal prosecution. Bushard's lawyer did not object to Howlett's testimony.

Howlett's testimony was not a comment on silence. Howlett, rather, related a conversation during which Bushard made a number of statements. Bushard's communicative gesture—"she just shook her head, didn't say anything else"—was part of and concluded a conversation in which it is claimed Bushard participated and had responded to other questions. Bushard thus had not remained silent. Howlett's testimony did not violate her constitutional right to be protected against self-incrimination.

Howlett's testimony is further discussed in part VI.

[3] At the conclusion of the first trial in 1986, Bushard was convicted of "conspiracy to commit murder" and first-degree murder. She contends that the verdict, conspiracy to commit murder, found her guilty of conspiracy to commit the common-law offense of murder, which is second-degree murder, and thus she was acquitted of first-degree murder. Therefore, she contends, she could not be retried for offenses greater than conspiracy to commit second-degree murder and second-degree murder.

While there is ambiguity in the 1986 verdict form, the jury expressed its intention not to acquit her of first-degree murder when it convicted her of first-degree murder. We are persuaded that, in

There is, however, substantial evidence that the use made of evidence claimed by the prosecutor to be corroborative of Stevens' testimony, omissions of her trial counsel,[4] and rulings of the trial judge,[5] might have deprived Bushard of her due process right to a fair trial and might have resulted in a miscarriage of justice.

I would remand to the trial court for a *Ginther*-type[6] hearing to explore what I consider to be disturbing aspects of this case, and would retain jurisdiction to consider, in light of such findings as the trial judge might deem appropriate, whether to order a new trial.

A

There is no need to cite authority in support of the following statements. Appellate courts review the record made at the trial to determine whether there has been error. Error is an incorrect ruling by a trial judge. Accordingly, there cannot be error unless the judge was asked to rule. No objection, no ruling, no error. And even if the judge rules

convicting Bushard of conspiracy to "commit murder," the jury intended to convict her of conspiracy to commit first-degree murder, not conspiracy to commit second-degree murder. Bushard's right to be protected from double jeopardy was not violated.

[4] There were also omissions by her appellate counsel.

[5] I do not wish to be understood as faulting the prosecutor, judge, or defense counsel. This opinion represents an overview that might not be possible for those in the trenches.

In part II *et seq.*, I state that the prosecutor, in closing argument, misled the jury, and that some of his statements were half-truths. Many lawyers approach closing argument in this "adversary" system of justice in much the same hit-and-run way. And many, if not most, judges would not seek to control such arguments, and for that reason defense counsel do not object. This may then be the standard, or the nadir of the standard.

The fault is not with the prosecutor, the judge, or defense counsel, but with ourselves. This Court has the obligation, in the exercise of its responsibility to establish rules of procedure and to regulate the practice of law in the courts, to require higher standards.

[6] *People v Ginther,* 390 Mich 436; 212 NW2d 922 (1973).

incorrectly, the error might not constitute error requiring reversal if, on a review of the record, it appears that the error was harmless. But, even in the absence of objection, an appellate court may recognize "plain error" where what occurred is deemed contrary to the sound administration of justice or there may have been a miscarriage of justice.

It would be premature to order a new trial respecting some of the matters adverted to in this opinion without first providing the prosecutor, Bushard's trial and appellate counsel, and the judge an opportunity to consider those matters, many of which have not been discussed in the briefs. After such an inquiry, and such findings as the trial judge might find to be appropriate, this Court should then consider whether a new trial should be ordered.

Frequently, a review of the record leaves the appellate court with the conviction that, while the defendant's trial was not a perfect trial, it was a fair trial, and any "error" was harmless. My review of this record leaves me with the impression that there might have been a miscarriage of justice. While Bushard might truly be guilty of first-degree murder and conspiracy to commit first-degree murder, she might, as she claims, be innocent.

B

I recognize that two juries have convicted Bushard, and that a third jury might convict her again. I also recognize that the trier of fact, generally a jury, decides whether Stevens or Bushard is telling the truth. For that reason, it is unusual for an appellate court to assess the weight of the evidence. In this case it is necessary to scrutinize the record.

I

Peggy Stevens was the principal prosecution witness. She acknowledged that she and her husband had hired Tony Hill to kill Rodney Fancher. She had been granted complete immunity from prosecution for any offense in exchange for her testimony against her mother and Hill.

The issues at the trial and appellate levels concern Stevens' veracity and credibility,[7] the efforts of Bushard's lawyer to impeach her credibility, and of the prosecutor to corroborate Stevens' claim that her mother, Bushard, conspired with Stevens and her husband, Harold Stevens, to kill Fancher.

A

Fancher was shot to death by Tony Hill on the evening of October 3, 1985. Hill had been hired by the Stevenses to kill Fancher.

The meritorious issue was whether Bushard joined in the conspiracy to have Fancher killed.

B

The Stevenses, another daughter, Cora Bushard, her son, Brian, and a brother, Larry Bushard, had all been living in Anna Bushard's home before Anna Bushard moved to Lansing in 1982, where they continued to reside with her.

Mary Fancher, Rodney Fancher's mother, lived next door. Cora Bushard and Rodney Fancher met when he was on leave from the army. Their relationship continued after he was discharged from the army.

Fancher had moved from his mother's home

---

[7] The issues also included, of course, Bushard's veracity and credibility.

next door to the Bushard home by early 1983.[8] All the principals—defendant Anna Bushard, Cora Bushard, her children Brian and Brad,[9] Cora's boyfriend Rodney Fancher, and the Stevenses—lived in the Bushard home[10] from early 1983 until June or July, 1984, when the Stevenses moved to a small town near Lansing.

The Stevenses had lost a little girl, who was fourteen months old when she died. The Stevenses, especially Harold, became attached to Brian. Fancher also became involved in raising Brian, and also became close to him.

C

After the Stevenses moved away in 1984, there was conflict arising out of the Stevens' efforts to see more of Brian.[11]

In 1985, Cora Bushard, with the support of her mother, reduced the frequency of Brian's visits to the Stevenses. There was conflict between Fancher and Harold Stevens arising out of the competition for Brian.

Peggy Stevens testified that Fancher punished Brian too harshly, was mean to him, would play too rough with him, and, when Brian claimed to be hurt, would be unsympathetic. He would twist Brian's arm behind his back and, when Brian said it hurt, would tell him to shut up.

---

[8] It appears that Rodney Fancher was unable to stay in his mother's home because she had met a man with whom she lived and it appears later married.

[9] Cora Bushard had another child, Brad, after she met Fancher.

[10] The Stevenses lived in a van parked near the Bushard home.

[11] Brian was six when Fancher was killed.

Brian would stay with the Stevenses for extended periods of time, and lived with them during the summer of 1984.

Bushard was often the mediator, sometimes siding with one daughter and sometimes with the other, regarding the amount of time Brian should be in one "home" or the other.

Peggy Stevens testified that her husband Harold began to discuss Fancher's treatment of Brian with Hill, the person who killed Fancher.[12] Harold had most of the conversations with Hill. Peggy was asked on cross-examination whether Harold had ever talked with Hill "about just thumping" (beating up) Fancher. She responded: "I think at one time it had been discussed with Tony about just having him beat up." She could not "remember" if Hill said, "[w]hy not shoot him," but *he could have made that statement.*

In her first confessional statements on Saturday, Peggy said that Hill had suggested that Fancher be killed. After there had been discussions on Sunday about the possibility of granting immunity to Peggy in exchange for her testimony, she revised her Saturday confessional statement to include her mother in the conspiracy. She acknowledged that if Hill suggested killing Fancher, that would be "different than your statement on Sunday when you said it was Anna [Bushard] that talked about having him shot . . . ."

Peggy Stevens testified that she and her mother, defendant Anna Bushard, had discussed Fancher's excessive discipline of Brian, and agreed that "something had to be done." Peggy said that she suggested that Fancher be beaten up, or have his arms and legs broken. According to Peggy, her mother said that would "just make him worse," and that Fancher should be killed. Peggy testified that at first she did not take her mother's statement seriously, but, when her mother repeated this in subsequent conversations, Peggy said she would see what she could do.

Peggy Stevens also testified that after the discus-

---

[12] Harold Stevens and Tony Hill worked together at an intermediate school district. Their employment there was a condition of their receipt of general assistance.

sions between Harold Stevens and Hill moved from beating to killing Fancher, Hill reported to Harold that he had talked to one of his friends and that Fancher could be shot, but that it would "take one thousand dollars." According to Peggy, she then talked to her mother, informed her of the price, and her mother replied that "she didn't have that much money, that it would have to be made in payments"—that she would have to pay "when she could and what she could."[13]

Hill agreed to do the deed. No money was paid to Hill before Fancher was killed.[14] Peggy testified, however, that her husband, Harold, transferred to Hill, as a "down payment" or "collateral," possession of a motorcycle Harold had obtained from his brother, David.[15] There is no evidence, other than Peggy's testimony, that Hill extended credit or that he truly expected to receive any money from the Stevenses after the killing.

[13] There is no evidence, other than Peggy's testimony, that the price was $1,000.

Peggy must have known that it would be a long time, if ever, before her mother, who was receiving general assistance, could come up with $1,000. The Stevenses nevertheless may have told Hill that her mother would supply $1,000 or some other sum of money.

[14] Hill obtained $60 from Harold to purchase a gun, which Hill said would cost $160. Hill kept the $60, did not buy the gun, and borrowed a gun from someone else. It was the better part of a year before the police tracked down the gun. Hill told the person who lent him the gun that he needed the gun to protect his family.

Peggy also testified that about a month after Fancher was killed, Hill demanded some payment with respect to the alleged price of $1,000, and that Bushard paid $100, which was transmitted to Hill. Bushard acknowledged that she gave Peggy $100, but said that this was to be transmitted to Harold Stevens, who was a backyard mechanic, and that he was to use the $100 to purchase parts to fix Bushard's automobile, which had been in disrepair for some time. This is discussed further in part IV.

[15] After Fancher was killed, Hill was involved in an accident that was investigated by the police. It appears that he was apprehensive that the police investigation would lead to his apprehension for the murder of Fancher. On the day of the accident and police inquiry, he hurriedly sold the motorcycle for $200 cash. Because the sale was arranged so urgently, it appears that the motorcycle may have been worth more than $200.

D

Anna Bushard acknowledged that her daughter, Peggy, had suggested that Fancher should be beaten up, or have his arms and legs broken. She said that she responded that "that wouldn't do any good . . . ." Bushard testified that she added: "violence never helped any situation." She denied that she suggested or agreed that Fancher should be killed.

Peggy Stevens thus acknowledged that she and her husband Harold were thinking of resorting to violence against Fancher. Their motive was their desire to punish him for mistreatment of Brian and what they perceived to be his role in withdrawing Brian from their society. She also testified that they were considering moving to Arizona and hoped that Cora Bushard would let them take Brian with them because Cora "didn't really care if she had him around."

Since Peggy Stevens acknowledged that she and her husband hired Hill to kill Fancher, the narrow factual dispute between Peggy and her mother was whether it was

- the Stevenses—who acknowledged that they had discussed with Hill having Fancher beaten up, or having his arms and legs broken; or
- Hill—who, according to Peggy, might have suggested "[w]hy not shoot him" and who had talked to one of his friends who would kill him for $1,000; or
- Anna Bushard—who Peggy acknowledged

said that violence would "just make him worse,"[16]

who suggested that Fancher should be killed, and whether Bushard joined in the conspiracy to do so.[17]

II

The trial essentially concerned the veracity and credibility of Peggy Stevens and her mother, Anna Bushard.

Peggy had been granted complete immunity from prosecution although she was admittedly deeply involved and a moving force in bringing about the killing. Because Peggy had been granted immunity in exchange for her testimony against her mother and Hill, her testimony was suspect, and probably would not be believed without more. It was therefore important for the prosecution to attempt to provide corroboration.

The lead opinion states that the trial was not

---

[16] Bushard testified that she responded that "that wouldn't do any good . . . ."

[17] In order to convict Anna Bushard, one has to conclude that the concept of resort to violence, which Peggy Stevens acknowledged she and her husband were considering, was something that Anna Bushard was ready to accept when suggested by Peggy, and even to go one major step beyond what Peggy said she and her husband were at first prepared to do. Stated differently, Peggy and Harold are two ne'er-do-wells who were prepared to beat up their sister's boyfriend because of jealousy or competition regarding her son Brian, to ruin her opportunity for happiness, who, in fact, hired the killer. Peggy then testified, in exchange for immunity, that her mother, not Tony Hill, came up with the idea of escalating a "thumping" or "beating up" to murder.

In this connection, it is noteworthy that there were a number of reputation witnesses who spoke well of Anna Bushard's reputation for truthfulness. She had six children and eight grandchildren. After her husband died, she raised the children on her own, and had never been involved in any conflict with the law, and had no prior record.

Peggy and Harold Stevens, in contrast, had lived on the edge, and, it appears, were thieves.

simply a "one-to-one credibility contest."[18] The prosecutor, in his closing argument, stated that it is not "Peggy versus Anna": "the evidence you've heard has supported Peggy Stevens' testimony in every way until we get to the denial by the Defendant," Anna Bushard.

The argument that the evidence supported Peggy's testimony "in every way" is extravagant. There was no testimony or other evidence supporting what she said occurred during her conversations and her husband's conversations with Hill, or what occurred during her conversations with her husband, or what occurred during her conversations with her mother.

A

The prosecutor, in closing argument, stated and reiterated that there was no reason for Peggy Stevens to lie at the time she changed her confessional statement to include her mother because she did not *then* have a promise of immunity.[19]

---

[18] *Ante,* p 387.

[19] Why would Peggy Stevens lie about her mother's involvement in a murder and a conspiracy to commit murder? That's one of the questions you need to answer, I think. Why would she lie, if she is? I submit when she started talking about it and you think it through, there's no reason for her to lie at that time, none that makes sense, none that makes sense.

* * *

And Peggy Stevens? Well, let's see if her motive is to get immunity, there's a problem, though, ladies and gentlemen. It's not as easy. There's no easy answer there. She included her mom before any immunity? She said nothing. She had a couple talks. And as stated by Kowalski, I'll take it to the Prosecutor, but I can't promise anything. And that's on Saturday the day before. And, yet, she still talks about her mother.

You know, you can probably figure out through the testimony you've heard, since they talked about immunity the day before on Saturday. Sergeant Kowalski knew the hitman, Tony Hill, because all the time they had the phone records showing the phone calls to Tony Hill and Tony Hill's phone calls to

That is not the whole truth. Before Peggy revised her confessional statement to include her mother, there were discussions with Detective Robert Kowalski about the possibility of her obtaining immunity.

The prosecutor's argument that Peggy Stevens had no "motive to lie on Sunday"—the revised confession implicating her mother was made on Sunday—because she had not *yet been promised* immunity is misleading. While she had not yet been promised immunity, the possibility of immunity had been discussed with Detective Kowalski, and she had a motive to lie on Sunday in the hope that the prosecutor would, on Monday or sometime thereafter, as he did, grant her immunity in exchange for testimony implicating her mother.

The prosecutor would not have been able to use Peggy Stevens' revised confessional statement against Hill or Bushard unless she was willing, in exchange for concessions agreed to by the pros-

---

Bushard—Anna Bushard's house. That's what they really had at the time Tony Hill. They didn't have this.

You heard the testimony. Kowalski didn't get the murder weapon until June of '86. They didn't have a way to definitely tie Tony Hill into that murder. So you can probably determine that Sergeant Kowalski was looking at immunity for Peggy based on the statements you've heard from Tony Hill.

Well, what happens? She throws in her mother? And, again, we're still at the point she has no immunity. She has nothing, yet. You can say, well, she had to testify, because otherwise she could be prosecuted. That's true. That's why she testified. But why include her mom before? They didn't have any evidence against Anna Bushard at that time. They didn't say, you give us your mom and we'll give you immunity. It was not that.

\* \* \*

We come right back again to why would she lie? Where's her motive to lie on Sunday?

\* \* \*

Why would Peggy lie? What's her motive to lie on Sunday before she's even gotten immunity?

ecutor, to repeat the substance of her revised confession at a trial.

**B**

The prosecutor's argument that Peggy Stevens had no "motive to lie on Sunday" makes especially important the judge's rulings precluding Bushard's lawyer from examining Peggy concerning a fraudulent filing by the Stevenses of a welfare application on which they had forged Bushard's name, and from examining Peggy concerning the theft of a trailer by Hill and one or both of the Stevenses.

1

Close family members do not generally falsely accuse one another of serious crimes. A jury thus might assume that Peggy Stevens was telling the truth. The prosecutor repeatedly asserted that Peggy had no reason or motive to lie.

Because family members do not generally falsely accuse each other of crime, such an accusation heightens the credibility of the accuser and enhances the believability of the accusation. For this reason, evidence indicating that Peggy Stevens had falsely implicated Bushard in criminal activity in the past is especially important and not merely cumulative of other evidence denigrating Peggy's credibility.

Although Peggy's credibility had been put in doubt by the evidence that she had been granted immunity from prosecution, and had revised her Saturday confession on Sunday to include her mother in the conspiracy after there had been discussion about the possibility of her obtaining immunity from prosecution, evidence that she had forged her mother's name to a fraudulent welfare

application, thus falsely involving her in a crime that the Stevenses themselves committed, might have led to a different result.

The evidence that was excluded might have overcome any assumption that Peggy's testimony implicating her mother is inherently more credible than testimony implicating a stranger or mere acquaintance. Cross-examination about the fraudulent filing might have led the jury to conclude that there was not such a familial relationship as to justify an assumption that Peggy would not involve Bushard in criminal activity or falsely accuse her of a crime. Had the jury heard this testimony, it might have found it to be more likely that Peggy would falsely implicate her mother in a crime that she had not committed.

2

At the first trial,[20] Peggy Stevens was cross-examined about the theft of the trailer by Hill's lawyer. She acknowledged that Hill and her husband Harold stole a trailer from B & L Campers during "that time period." She said she was home at the time.

The trailer was brought to the Stevens' home by Hill and Harold. Peggy denied any knowledge of conversations concerning payment of money to Hill for his assistance in stealing the trailer. Hill testified that he received $100 from the Stevenses one month after the killing, but said that it was for his assistance in stealing the trailer—not, as Peggy testified at the first and second trial, for killing Fancher.

The record does not disclose that Bushard's lawyer made an attempt to obtain Hill's appearance to testify at the second trial. Nor does it

[20] See n 1.

appear why, except for the failure to show that Hill was unavailable, his earlier testimony was not admissible.

3

In sum, Bushard was accused by Peggy Stevens, who could have been shown through cross-examination to have sought to involve Bushard in criminal activity committed by the Stevenses, and who might have been shown through cross-examination to have lied about the reason $100 was paid to Hill.

This was a "one-to-one credibility contest." The limitation of the cross-examination of Peggy appears to justify a new trial.

C

There is no claim or evidence that either Hill or Harold Stevens spoke to Anna Bushard. There was thus no testimony, other than Peggy's testimony, that Bushard joined in the conspiracy, or that the price was $1,000, or that Hill extended credit.

Since neither Hill nor Harold Stevens spoke to Bushard, and Peggy Stevens was the sole source of their information about Bushard's alleged participation in the conspiracy, no statement by Hill or by Harold—reported at the trial by Peggy, David Stevens, or Detective Kowalski—can corroborate Peggy's testimony.

Nor was Peggy's testimony corroborated by Bushard's acknowledgment that, a few weeks before the killing, she had provided Peggy with Fancher's name and phone number to be posted at Don's Truck Stop, and that she had paid $100 to Peggy about a month after the killing. *The issue* about both the posting of the note and the pay-

ment of $100 *is the reason Bushard did what she concedes she did.*

Did Bushard participate in the plan to post the note at Don's Truck Stop in a family effort to find Fancher work, as she claimed? Did she pay the $100, as she claimed, to purchase parts to repair her automobile? Or did she do what she did as part of the conspiracy? As to that issue—why she did what she did—it is Anna versus Peggy. There is nothing else.

Bushard's testimony that there was family discussion about posting a note—to find work for Fancher—and concerning the reason why the $100 was paid—to pay for parts for her automobile—was corroborated by the testimony of other witnesses.

There is nothing to corroborate Peggy's testimony that Bushard's role in the plan to post the note and her payment of the $100 was part of the conspiracy. As to that—the reason that Bushard did what she concedes she did—Peggy's testimony stands alone without corroboration.

With the exception of the testimony of Rhonda Howlett, a cellmate of Bushard's, the bulk of the asserted corroboration of Peggy's testimony was essentially repetition of, or dependent on, the assertions of Peggy, of the nature of hearsay,[21] and was essentially bootstrap corroboration.[22]

III

Before discussing in greater detail the evidence concerning the posting of the note at Don's Truck

---

[21] Detective Kowalski's recital of what David Stevens said and what Harold Stevens said, and Peggy Stevens' recital of what Hill said immediately before shooting Fancher, and Rhonda Howlett's recital of what Katherine Wright said.

[22] Kowalski's recital of what David and Harold Stevens said, and Peggy Stevens' recital of what Hill said.

Stop (part v) Peggy Stevens' receipt of $100 from Anna Bushard a month after the killing (part IV) and the testimony of cellmate Rhonda Howlett (part VI), I turn to a discussion of the "bootstrap corroboration," relied on by the prosecutor as corroboration of Peggy's testimony.

The bootstrap corroboration was in the nature of hearsay, or was hearsay, or possibly within an exclusion or exception to the hearsay rule. Defense counsel did not seek to bar the bootstrap corroboration on the basis that it was hearsay,[23] or not within a hearsay exception,[24] or was not of probative value, or that any probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.[25]

At the remand hearing that I would order, the legal issues could be explored and the question whether Bushard is entitled to a new trial, at which the bootstrap corroboration would be excluded, could be considered.

A

The first statement, chronologically, was Detective Kowalski's report that David Stevens, Harold's brother, telephoned him Saturday night, after Peggy and Harold Stevens had been arrested, to report, on the basis of a telephone conversation with Harold, that Bushard was the "push" behind the killing of Fancher. Detective Kowalski testified that Anna Bushard became a focus of the police investigation for the first time after David Stevens' telephone call to Kowalski.

The only source of David Stevens' accusation

[23] MRE 802.
[24] MRE 803 and 804.
[25] MRE 403.

was a telephone conversation with Harold. And Harold's assertion is dependent on the veracity of Peggy, who alone claims that she had conversations with her mother concerning her mother's involvement in the conspiracy.[26]

Harold's repetition to his brother David of what Peggy was claimed to have told him, and David's repetition to Kowalski of what Harold told him, does not corroborate Peggy's testimony. This is bootstrap corroboration.

### B

Detective Kowalski testified that, after Peggy revised on Sunday the confession she gave shortly after she was arrested on Saturday to include her mother in the conspiracy, he again spoke to Harold, who then also involved Bushard in the conspiracy.

Putting aside until the next paragraphs of this opinion whether it was probative that Harold's statements involving Bushard allegedly coincided with Peggy's revised confession, and focusing on whether what Harold said to Kowalski was corroborative of what Peggy said, once again, since Harold did not speak to Bushard, whatever Harold told Kowalski was dependent on what he claims Peggy told him about her conversations with her mother. Thus, again, whatever was said by Harold to Kowalski is not corroborative of the veracity of Peggy because all there is is repetition of what Peggy is alleged to have told Harold. More bootstrap corroboration.

---

[26] Harold Stevens spoke to his brother David after he and Peggy had given confessional statements implicating themselves in the murder. Those first confessional statements did not implicate Bushard. After the telephone call from David Stevens, and in conjunction with conversations regarding possible immunity for Peggy, she revised her statement to implicate her mother, and Harold also implicated Anna Bushard.

The lead opinion states that Kowalski testified
that the Stevenses, "separately questioned, gave
identical statements regarding Bushard's involve-
ment."[27] Having in mind that the idea of involving
Bushard in the police investigation *originated with
Harold,* it is neither remarkable nor probative
that Harold's statement concerning Bushard's in-
volvement matched Peggy's statement.

On Saturday night, after the Stevenses both had
confessed their involvement in the killing, Harold
was looking at life imprisonment without possibil-
ity of parole, and, quite understandably, for a way
out.[28] It apparently occurred to him, possibly to
Peggy also, that they might obtain some mitiga-
tion or immunity by involving Bushard. We know
this because it was Harold who—although he had
never spoken to Bushard—telephoned his brother
David on Saturday night, and, following that con-
versation, it was David who telephoned Kowalski
to suggest that Bushard was the "push" behind
the murder.

Peggy and Harold would have had no difficulty
in coming up with parallel versions of Bushard's
involvement. All they had to do was repeat to
Kowalski what, according to Peggy, they told Hill.
Peggy said that they told Hill that Bushard would
come up with money. It would not have taken
more than a few minutes, or even less[29] for them
to agree to tell Kowalski the same story about the
abuse and mistreatment of Brian, and Bushard's
involvement in the conspiracy to kill Fancher, that

[27] *Ante,* p 388.

[28] Harold apparently found a way out for his wife, Peggy, but not
for himself. He was at first found incompetent to stand trial, and
later was found competent to stand trial, stood trial, and was con-
victed of first-degree murder.

[29] Peggy acknowledged that they had a few minutes, that they
spoke quietly, and that she did not think they could have been
overheard by the officers.

they had, over six meetings with Hill, related to him, in a successful effort to persuade him to kill Fancher. They simply had to be as persuasive with Detective Kowalski as they had been with Hill.

It is noteworthy that there is no verbatim record of the interrogation or of the original or revised confessional statements made by Peggy or Harold Stevens. There is neither a stenographic nor an audio record. Notes were taken, and Kowalski testified on the basis of his recollection and notes.

C

Returning to the bootstrap corroboration, there is the statement attributed by Peggy to Hill that, shortly before he shot Fancher, he said in effect "this is for the way you've treated Brian, . . . that was the way [Grandma] had wanted it."

Since Hill never spoke to Bushard and was dependent on what Peggy and Harold told him, and Harold was dependent on what Peggy told him about Bushard's involvement, Hill's reported statement is, again, bootstrap corroboration without probative value, independent of whether Peggy was telling the truth.

1

Peggy's recital of Hill's alleged statements shows, at most, that Peggy and Harold had succeeded in persuading Hill that Fancher was a drug and child abuser, and that Bushard wanted him killed.

While it is clear, as a matter of ordinary logic, that Hill's statement was without probative value, the illogic in according any weight to Peggy's repetition of Hill's alleged statement is not readily apparent because the key factual point—neither

Hill nor Harold ever had direct communication
with Bushard—*was not highlighted.*

### 2

The prosecutor accorded great probative value to
Hill's nonprobative statement. He used this non-
probative evidence to close his rebuttal argument
to the jury:

> It comes down to that statement Tony Hill made
> on October 2nd—excuse me—October 3rd at 9
> P.M. as he had the gun to Rodney's chest and put
> him in the ditch. He's down in the ditch. You can
> look at the picture. He comes out with that state-
> ment. This is for Brian. This is the way his grand-
> mother wants it.

The prosecutor thus argued, dramatically,
rhetorically, and effectively that Hill, the killer,
confirmed, as he was about to blow Fancher apart
with a shotgun, that Bushard had hired Hill to kill
Fancher because of his mistreatment of Brian.

In thus using Peggy's testimony—repeating
what she said Hill said, which, at best, was what
she and Harold had persuaded him of—to bolster
her credibility, in omitting that Hill had no inde-
pendent knowledge of whether Bushard wanted
Fancher killed, the prosecutor again misled the
jury. This was not a minor point. The prosecutor
closed his rebuttal argument with this misleading
testimony and argument.

### 3

Peggy Stevens' recital of what she says Hill said
he said, which at best was based on what Peggy
said she and Harold had said to Hill, should thus
have been excluded because it had no probative

value, and any probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. This recital should also have been excluded because it was not within the exclusion for statements by a coconspirator.[30]

Bushard's lawyer made an effort, by motion in limine, to bar this recital as not within the exclusion for statements by a coconspirator. The prosecutor argued that the conspiracy was not complete at the time Hill reported to the Stevenses what had occurred at the time Fancher was killed because Hill had not been paid in full the $1,000 that Peggy said had been promised him. The judge deferred ruling on this issue, and the record does not disclose a renewed objection by Bushard's lawyer.

It is possible that both lawyers and the judge ultimately may have concluded that the first opinion of the Court of Appeals precluded challenge except on further appeal to this Court. The first opinion said that "[a]lthough we are persuaded of no error arising from codefendant Bushard's remaining issues, our decision to reverse and remand renders further analysis unnecessary." The record does not disclose that the lawyers and judge so concluded, and therefore we would not be justified in so concluding without exploring this on the remand I would order.

Hill's statement to Peggy Stevens concerning what he allegedly told Fancher would not have been admissible under the exclusion for a coconspirator's statement unless, when Hill made the statement to Peggy, the conspiracy to murder

---

[30] A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy on independent proof of the conspiracy. [MRE 801(d)(2)(E).]

Fancher was, although he was dead, continuing and, although he was dead, was made in furtherance of the conspiracy.[31]

The lead opinion would hold that the conspiracy was continuing at the time that Hill made the statement to Peggy:

> Hill's statement was made "in furtherance" of the conspiracy to murder. Reporting the details of the crime to Peggy and Harold Stevens, presumably insured that he would collect his remaining payments, one of the main objectives of the killing as far as Hill was concerned, and a part of the conspiratorial understanding of all four conspirators.[32]

The lead opinion thus concludes that because Peggy testified that, a few days after the killing, Hill related what occurred at the time of the murder, and also testified that she paid Hill a month later $100 in respect to the $1,000 she testified Hill was promised, the conspiracy was ongoing. Adoption of the prosecutor's approach would mean that the conspiracy to murder Fancher is still continuing, because Hill never received the $1,000.

The reliance on *People v Centers*, 141 Mich App 364; 367 NW2d 397 (1985), is misplaced. There, the "financial arrangements" concerned the division of the spoils of the crime of armed robbery. The Court of Appeals, in finding the testimony concerning the out-of-court statements of a coconspirator were *not* admissible said:

> No evidence suggests that any proceeds of the

---

[31] *People v Trilck*, 374 Mich 118; 132 NW2d 134 (1965); *People v Centers*, 141 Mich App 364; 367 NW2d 397 (1985), vacated on other grounds 422 Mich 951 (1985).

[32] *Ante*, p 396.

crimes remained to be divided or that any other arrangements between the conspirators remained to be completed.[33]

The Stevenses, in an effort to create an alibi, had left town shortly before Fancher was killed, and had left their dog with Hill. A few days after they returned, they saw Hill, possibly for no other reason than to pick up their dog. In all events, that was when Hill allegedly made the statement to the Stevenses reported by Peggy at the trial. By then, Bushard had learned that Fancher had been killed, and it appears, although the record is not specific, that the Stevenses had also learned of Fancher's death. There thus was no need to "report back" that Fancher had been killed. Nor is there any evidence that Hill agreed to report back, or that reporting back was a precondition of his entitlement to further payment.[34]

It is conjecture, unsupported by the record, that Hill's asserted statement to Peggy had the "presumable" goal of assuring "that he would collect his remaining payments." Since Bushard is claimed to have been financing this conspiracy, one would expect that if the "presumable" goal of Hill making the statement was to assure that he would collect his remaining payments, there would be some evidence that Peggy reported to Bushard what Hill is claimed to have said. The prosecutor

[33] *Id.*, pp 375-376.

[34] Hill's statement to Stevens appears to be merely a recital of the details of the murder, and not the result of an agreement to report.

Peggy Stevens testified that Hill told her that he committed the murder and left Fancher's body in Barry County because Barry County would not investigate as much. That testimony would not support a finding that it was part of the conspiracy that Fancher be murdered in Barry County. Nor does that statement—made a month before the $100 was paid—indicate that the statement furthered an object of the conspiracy.

made no effort to adduce from Peggy that she had reported to Bushard what she claims Hill said.

Since there is no evidence that it was part of the conspiratorial agreement that Hill, before killing Fancher, would say to him, in effect, this is for your mistreatment of Brian and this is the way Grandma wants it, or that Hill's statement to Fancher or report back to the Stevens was to increase the likelihood that he would be paid, there is no basis in the record for a finding that what was said to have been said shortly before Fancher was killed, or the report back, was in furtherance of the conspiracy.

4

It appears that Bushard is entitled to a new trial because the statement concerning what Hill allegedly said to Fancher shortly before killing him, was not probative, was likely to confuse, mislead and prejudice the jurors, and was not within exclusion for statements of a coconspirator.

IV

It is not claimed that Bushard paid any amount toward the alleged price of $1,000 until November, 1985, over a month after the killing.

According to Peggy Stevens, in November, 1985, Hill demanded payment of some amount in respect to the alleged $1,000 price. She said that she discouraged him from calling her mother, with whom Hill until then had no communication.[35]

Anna Bushard acknowledged paying $100 to Peggy Stevens in November, 1985. Peggy testified

[35] Bushard's lawyer claimed that the reason why Peggy discouraged Hill from calling Bushard is because such a call would have alerted her to Peggy's involvement in the conspiracy to kill Fancher of which she was not aware at that time.

she gave the sum received from her mother to Hill.[36]

Bushard said that she gave the $100 to Peggy so that she could give the sum to Harold to fix Bushard's automobile. There was substantial corroboration of Bushard's testimony that her automobile had been in disrepair for over a month before Fancher was killed, that Harold was a backyard mechanic who kept the family automobiles in repair without charge for his labor, but that Bushard would have to pay for the parts.[37]

Larry Bushard testified that his mother had borrowed $396 from him, when some money orders were lost, so that the house payment could be made, and that when the money for the lost money orders was recovered, he kept $300 and allowed his mother to have $96 so that she could have her automobile repaired. Bushard said that she added $5, put one dollar back in her purse, and then gave the $100 to Peggy Stevens.

The payment of $100 by Bushard to Peggy does not corroborate the veracity of Peggy's testimony *concerning the reason it was paid.*

No evidence contradicts Bushard's testimony that it was paid to buy parts to repair her auto-

---

[36] There is no evidence, other than the testimony of Peggy Stevens, that the money received from Anna Bushard was paid to Hill.

Hill testified at the first trial that he did, indeed, receive $100 from the Stevenses. He said that this was paid to compensate him for his efforts in assisting Harold Stevens to steal a trailer that would be used by the Stevenses to travel to Arizona. One of the issues, discussed in part II, is whether it was error to refuse to allow Bushard's lawyer to cross-examine Peggy concerning Hill's testimony at the first trial concerning the reason the money was paid to him. See part II(B)(2), pp 410-411.

[37] There was testimony that the carburetor needed to be replaced. Peggy Stevens, Bushard, and Cora and Larry Bushard testified that Harold fixed the family automobiles, but Bushard would have to pay for the parts. Disinterested persons testified that Anna Bushard's automobile had been in disrepair and she had been inconvenienced thereby.

mobile other than Peggy's testimony that it was paid to provide money to make the first payment to Hill. No evidence corroborates Peggy's testimony.[38]

With that in mind, it cannot be said that the jury would have reached the same verdict if the judge had not precluded Bushard's lawyer from examining Peggy concerning a fraudulent filing by the Stevenses of a welfare application on which they had forged Bushard's name, and from examining Peggy concerning the theft of a trailer by Hill and one or both of the Stevenses.

## V

Peggy and Harold Stevens plotted with Hill to lure Fancher away from Cora Bushard and her children by having Hill pose as a trucker who would pay $80 to unload a semitrailer. If Fancher asked how Hill obtained his name, Hill was to respond that he saw his name posted at Don's Truck Stop.

Hill telephoned Wednesday morning, October 2, 1985, and offered Fancher the job, which he accepted. He telephoned that night to say that the truck had broken down. It was agreed that Hill would meet Fancher Thursday night. Fancher met Hill, they drove to a secluded spot, and Fancher was killed.

## A

It appears that the idea of posting a note at Don's Truck Stop grew out of another source of conflict in the Bushard household, a shortage of

[38] See n 36.

money,[39] which was exacerbated by Fancher's inability to find steady work. Fancher had an eighth-grade education and could only find part-time jobs.[40]

Peggy Stevens and her mother *both* testified that there had been family discussions about posting a note at Don's Truck Stop stating that Fancher was looking for work unloading trucks. Such discussions, in July-August, 1985, preceded the conspiracy to murder Fancher, who was killed in early October.

Peggy testified that she, her husband Harold, and Hill decided that Hill would pose as a trucker

[39] Although Fancher had not been able to find work and wanted to be able to support Cora Bushard and her children before they married, in mid-1985 they decided to marry and began looking for an apartment.

The prosecutor sought to establish, as a possible motive for Anna Bushard to join in the conspiracy to kill Fancher, that she was concerned that she would be unable to maintain her home if Fancher married Cora and moved away. There was, however, little if any evidence, other than the shortage of money, that would support such a theory. The prosecutor did not argue this theory to the jury.

Bushard denied that she was aware of Fancher's and Cora Bushard's plans to marry. It is a well-established principle that disbelief of a witness is not affirmative evidence of the contrary. Thus, disbelief of Cora Bushard's assertion that Anna Bushard had not been informed of her plan to marry Fancher and move away, does not constitute affirmative evidence that Anna Bushard had been informed of their plans to marry and move away, or that, when she was so informed, she became upset.

Cora testified that she confided their plans only to her brother, Larry. Larry, who had a good-paying job, testified that he had been looking for a more suitable and less expensive residence for his mother, and that he did not inform his mother of his sister's plan to marry Fancher.

Mary Fancher testified, however, that she was aware of their plans to marry.

Rhonda Howlett, a cellmate of Bushard, testified that Bushard said that she and Cora Bushard were living in a house together with her children, and they were buying a house that they were living in, and that she "did not want Cora to leave." Howlett's testimony does not indicate that Bushard was aware of Fancher and Cora's plans to marry and move away. Howlett's testimony is further discussed in part VI.

[40] Mary Fancher contributed food to the Bushard household for her son, Rodney.

responding to a note posted at Don's Truck Stop to lure Fancher from Cora and the children to a place where he could be killed. At first she could not recall whether she had informed her mother of the ruse, but, ultimately, under persistent questioning by the prosecutor, said that she had.

The prosecutor claimed that Bushard wrote Fancher's name and phone number and gave it to Peggy as part of Bushard's role in the conspiracy. Bushard claimed that she did so in an effort to obtain work for Fancher.[41]

B

The ruse, that such a note had been posted at Don's Truck Stop, depended for its success on Fancher believing that such a note had been posted. If Fancher were to inquire where Hill obtained his name, he would be told it was at the truck stop.

The conspirators apparently thought that Fancher would believe that a note had been posted because of family discussion about posting such a note in an effort to find work for Fancher. Because the conspirators thought that Fancher would believe that a note had been posted, it is not surprising, and does not implicate Bushard in the conspiracy, that she knew about plans to post such a note.

The prosecutor portrayed the plans to post a note as a conspiratorial secret. It is clear from all the evidence—including Peggy's testimony—that there were plans to post a note separate and apart

---

[41] Bushard testified that she had agreed to post such a note at Don's Truck Stop, but had been unable to do so because she had no money for gas and, later, because her automobile was not working. Subsequently, she wrote Fancher's name and phone number on a piece of paper and gave it to Peggy so that she could post a note at the truck stop. Peggy testified that she wrote a note but never got around to posting it.

from the misuse of these plans to lure Fancher to his death.

Mary Fancher,[42] Rodney Fancher's mother, testified that she was at the Bushard home on Wednesday night, the night before her son was murdered. She asked how whoever called Fancher had obtained his name. Bushard responded that she had given the name and phone number to Peggy to post at Don's Truck Stop. This, the prosecutor argued to the jury, shows that Bushard was a part of the conspiracy. Otherwise, she would not have known that a note was supposed to have been posted at the truck stop.

It is clear, however, from the testimony of the prosecutor's principal witness, Peggy, that there was an innocent explanation for Bushard's knowledge of the plan to post a note. Fancher had experienced difficulty in obtaining even part-time work, and there had been family discussions about posting a note at Don's Truck Stop seeking work for Fancher unloading trucks.

Peggy confirmed Bushard's assertion that there had been such discussions. Peggy testified: "Back early that summer I think I had mentioned it [about this note about getting a job] to him [Fancher] once when he asked if I knew of a place he could pick up some work." She also confirmed that Bushard had provided her with Fancher's name and phone number before the time that it was claimed the conspiracy to kill Fancher was entered into. Other family members also confirmed that there were discussions about posting such a note at Don's Truck Stop.

Surmise by Bushard that a call to unload a truck was the result of Peggy Stevens' actually having posted a note at Don's Truck Stop would

---

[42] At the time of trial, she had remarried and was Mary Haker.

come to the mind of a person who had participated in family discussion about Peggy posting a note.[43]

C

To be sure, Cora Bushard denied that there were family discussions about the note, and the lead opinion adverts to her testimony.[44] Her testimony at the preliminary examination, two years before the retrial, when her memory probably was clearer, corroborated the testimony of *Peggy* and Bushard, and of her sister that there had been family discussions about posting a note at the truck stop to find work for Fancher.[45]

---

[43] The prosecutor argued:

Where did [Fancher] ever mention that this caller was calling in response to a note at Don's Truck Stop? Where? When? If he did, how come Cora didn't hear him say it? How did she know that was going on?

Fancher reported, however, that he had received a telephone call to unload a truck. It is quite irrelevant whether he told Cora that the person who called said that he had seen a note at Don's Truck Stop, especially since no note was ever posted there by Peggy. This argument also might have confused and misled the jury.

[44] Defendant testified that her daughter Cora, Rod's girl friend, had asked her in September if she would post a note. However, the jury was also entitled to credit Cora Bushard's contrary testimony concerning the note. Cora testified that the defendant told her that Peggy posted a note at Don's Truck Stop. While Cora also stated that she did not recall when any discussion about a note occurred, she admitted that she probably did not know about it before *she* asked her mother on October 2, 1985, how the man who called Rod knew he was looking for work. [*Ante,* p 389. Emphasis in original.]

[45] The following are excerpts from Cora's preliminary examination testimony:

*Q.* Was there any time that you recall a discussion in the family about Rod looking for a job?
*A.* Yes, sometime they had mentioned like putting his name at Don's Truck Stop because he could unload trucks.
*Q.* Do you remember who they were that said that?
*A.* My brother-in-law, sister and mother.

No effort was made at the trial to refresh Cora Bushard's recollection, or possibly to impeach her testimony by her testimony at the preliminary examination.[46]

---

\*   \*   \*

*Q.* Whose idea was it to put up the notice at Don's Truck Stop about a job?

*A.* I don't know which one of the three had thought about it.

*Q.* What do you mean by three?

*A.* Anna, Harold or Peggy.

*Q.* Do you know when that was done?

*A.* Sometime in the middle of September. I'm not sure of the date.

\*   \*   \*

*Q.* Okay, did your mother assist him [Rod] in any way in this [looking for a job and putting in applications]?

*A.* No.

*Q.* Did your brother-in-law or sister assist him in any way in this?

*A.* No, just the one about suggesting putting his name at Don's Truck Stop.

*Q.* Alright [sic] and they agreed that they were going to help him get a job by putting up his bulletin advertising himself for work?

*A.* Yes.

\*   \*   \*

*Q.* So how long before this phone call, if you remember, did he have this advertisement put up at Don's Truck Stop?

*A.* I think it was somewhere in the middle of September they put it up. Now I don't know exactly when they put it up.

\*   \*   \*

*Q.* So you are talking a couple of weeks before he got a call after this advertisement was put up?

*A.* Yes.

*Q.* Did you ever see the advertisement up?

*A.* No I didn't[.]

*Q.* Do you [even] know that it was put up there?

*A.* Just by Harold and Anna saying that they put it up.

*Q.* Harold and who?

*A.* And Anna and Peggy, them saying that they put it up.

---

[46] On the day that Bushard was sentenced, Cora Bushard advised Bushard's lawyer that her recollection had been refreshed concerning the posting of the note. After sentencing, a motion for a new trial on the basis of newly discovered evidence was made and denied.

**D**

In arguing the case to the jury, the prosecutor claimed that there was a conflict between Mary Fancher's testimony and Bushard's testimony concerning the posting of a note at Don's Truck Stop, and that this showed that Bushard was lying. "Rhonda Howlett's[47] lying, Peggy's lying, *Mary Fancher's lying. Who's lying?*"

In cross-examining Bushard, the prosecutor misrepresented Mary Fancher's testimony in an apparent effort to create a conflict between Mary Fancher's testimony and Bushard's testimony.[48]

Bushard, in her testimony on direct examination, said that she had written Fancher's name and phone number on a piece of paper and had given it to Peggy who was to post a note at Don's Truck Stop in an effort to obtain work for Fancher. Bushard thus distinguished between writing the name and phone number on a piece of paper and writing the actual note to be posted.

Mary Fancher, who testified during the prosecutor's case in chief and thus before Bushard testified, did not testify that Bushard said that she wrote the note to be posted at Don's Truck Stop. She said, rather, "Anna spoke up and said that she had written Rodney's name and phone number on a *slip of paper* and gave it to Peggy and Harold to take and put on" the bulletin board at Don's

---

[47] The cellmate. See part VI.

[48]   *Q.* Mary Fancher said that you told her *you wrote the note?*

  *A.* That's what she said. That wasn't what I said. I said that Peggy said that she would write the note and put it up on the board.

  *Q.* So you disagree with Mary Fancher on that point?

  *A.* Yes, because I never wrote the note.

  *Q.* You never said you did?

  *A.* I never said I wrote the note. [Emphasis added.]

Truck Stop. On cross-examination, she testified that Anna said that she *"gave the phone number and name to Peggy."* She also said, "All I know is she [Anna Bushard] put *Rodney's name and phone number* on the paper for them" "[a]nd gave it for them to put on Don's Truck Stop on the bulletin board there."

Mary Fancher concluded that, as far as she knew, all that Bushard gave them was *"the name and phone number and not a written note."*

It is clear that there was no real conflict. Yet the prosecutor sought to mislead Bushard in a purposeful effort to create a conflict that he could exploit before the jury—Bushard claimed that Mary Fancher, the mother of the murdered Rodney Fancher, is lying: "Mary Fancher is lying." He could then ask the jury to conclude that Bushard was lying because Mary Fancher was telling the truth.

**E**

The prosecutor also misled the jury when he argued that Bushard said:

> I wrote the note out, and I gave it to Peggy to put up. *The note* was—this note, that was the idea *to get Rodney away from Cora.* [Emphasis added.]

Bushard did not testify: "I wrote the note" "to get Rodney away from Cora." The prosecutor thus, again, misled the jury concerning the evidence.

**F**

The lead opinion states that the jury was "entitled to conclude that the fictional note was a ruse and that Anna's statement that the call had come in response to a note she had personally written

and allegedly given to Peggy and Harold to post, confirmed her participation in the plot to kill Rod Fancher."[49]

The idea that the prosecutor apparently succeeded in implanting in the jury's mind—and which the signers of the lead opinion believe the jury might have found to be persuasive—was that when Bushard responded as she did to Mary Fancher it was a slip of the tongue, and she thereby incriminated herself by revealing something that was or should have been kept secret. Posting a note at Don's Truck Stop was not, however, a secret.

The conspirators thought Fancher would believe that a note had been posted at Don's Truck Stop. The reason they thought he would believe the ruse was because posting a note had indeed been discussed in the Bushard household and with him.

The plan to post a note at Don's Truck Stop does not corroborate Peggy's testimony, despite the purposeful effort to create conflict between Mary Fancher and Bushard's testimony, the minute differences in testimony, and Cora Bushard's memory lapse. There was no essential conflict in the testimony of the witnesses *except the conflict concerning the reason the note was to be posted.* Did Bushard provide the name and telephone number *to find work for Fancher?* Or did she provide that information as a means of *luring Fancher from the house?* It is, again, Anna versus Peggy, a one-to-one conflict between the testimony of Bushard and Peggy.

It cannot be said that the jury would have reached the same verdict if the judge had not precluded Bushard's lawyer from examining Peggy concerning a fraudulent filing by the Stevenses of a welfare application on which they had forged

[49] *Ante,* p 388.

Bushard's name, and from examining Peggy concerning the theft of a trailer by Hill and one or both of the Stevenses.

## VI

Turning to the testimony of Rhonda Howlett, she and Katherine Wright were cellmates of Anna Bushard while she was being held for trial. They were repeat offenders charged with crimes of theft of one form or another.

I am troubled about the practice of putting a person like Anna Bushard, who had no prior involvement with the law, in a cell with such persons. Not infrequently, by the time of trial, a cellmate comes forward with testimony favorable to the prosecution.[50]

Until Rhonda Howlett and Katherine Wright provided testimony, the prosecutor, who had granted complete immunity to Peggy Stevens in exchange for her testimony, had nothing to corroborate Peggy Stevens' testimony other than bootstrap corroboration.

Rhonda Howlett's testimony consists of two parts. One part consists of statements claimed to have been made by Bushard. The second part is the accusation attributed to Katherine Wright: "Anna, you're saying that you're guilty."[51]

## A

Howlett testified that Bushard made the follow-

[50] On cross-examination at the first trial, Katherine Wright acknowledged that she was an "old con" aware of the ways of prisoners and "her way around" when imprisoned. She denied that she solicited or encouraged other prisoners to talk about their cases. She never asks a prisoner "when they first come in" what they are there for. That is their private business.

[51] See n 2 concluding that Howlett's repetition of Wright's statement did not violate Bushard's constitutional right to be protected against self-incrimination.

ing statements: that "she did not want Cora to leave" her home, that she had "given Peggy some money and that she wasn't supposed to come in contact with anyone. She was more or less in contact with Peggy," that Peggy "was supposed to have given it [the money] to Tony," and that "the way they planned it, it was supposed to have happened on a Wednesday, but it happened on a Thursday."

On cross-examination, Bushard's lawyer observed that Bushard's alleged reference to "the way *they* planned it" was vague and did not necessarily mean that Bushard took part in the "plan." Howlett's response carefully distinguished between "we" and "they"—she said that the term used was "they."[52]

Bushard's lawyer also inquired whether Bushard was involved in court proceedings on the day that the conversation occurred, and Howlett responded:

I don't know what type of proceedings she was

---

[52] Cross-examination by Bushard's lawyer:

*Q.* I want to be very specific on what you just testified to, ma'am.

When you used the words—I believe you said they—the way they planned it. It was supposed to happen on Wednesday or supposed to happen on Wednesday and then it didn't happen on Wednesday, it happened on a Thursday; is that right?

*A.* That's correct.

*Q.* Okay. The word "they" has several connotations to it, doesn't it?

*A.* Indeed it does.

*Q.* And they could mean a group like us, or it could mean other people, couldn't it?

*A.* Yes, it could.

*Q.* And she didn't distinguish between whether that meant the group she was involved in or she was just talking about how other people planned something, did she?

*A. No, she never distinguished, no, she didn't.*

involved with at all, really. All I know is she left the cell, and she went and talked to somebody and came back. I don't know what it was for or whom she talked to.

Bushard testified that at the time she was involved in pretrial proceedings while being held in jail, and that during those proceedings she learned that the murder was originally planned for Wednesday and occurred on Thursday. She said that her cellmates had newspaper accounts of Fancher's murder and talked about what they had read. She also said that she told them what she knew about the case, and that she was taken to a hearing the day the conversation took place, possibly the preliminary hearing. Bushard's lawyer argued that the statements attributed by Howlett to Bushard referred to statements by Bushard concerning what she had learned about the case while she was out of her cell that day.

Howlett's phrasing of Bushard's statements can be read consistently with Bushard's testimony. According to Howlett, Bushard said "that she had given Peggy some money and that she wasn't *supposed* to come in contact with anyone. She was more or less in contact with Peggy," that Peggy "was *supposed* to have given it [the money] to Tony." (Emphasis added.) That phrasing is consistent with the claim of Bushard's lawyer that she was relaying information she was told—but didn't know—happened. Some laypersons may use "suppose" in the same sense that others might use "allege," to indicate that something did not occur, such as, "I was supposed to have cleaned my room," "Fred was supposed to have hit him," "Supposedly, she shot him."[53]

---

[53] Bushard denied making these statements to Howlett. Her denial was not explored by the prosecutor. It was not until redirect examina-

B

Howlett denied that she had received any consideration for her testimony.

Katherine Wright testified at the first trial. She acknowledged that, in exchange for her testimony, the prosecutor had agreed not to file a supplemental information charging her as a repeat offender.

Katherine Wright did not testify at this trial, and the consideration that she received for her testimony was not made known to the jury.

The prosecutor argued to the jury that *Howlett* received no consideration in exchange for her testimony. That statement was a half-truth. The portion of Howlett's testimony that he most emphasized was Wright's statement that, "Anna, you're saying that you're guilty."[54]

Wright's accusation, repeated by Howlett, is again an unsworn statement of the nature of hearsay. Wright's accusation was not offered simply to show how Bushard reacted. The accusation was offered for its probative value and was re-

---

tion that Bushard's explanation was brought out. Her flat denial may have been simply a denial that the statements meant what the prosecutor asserted that they meant. She acknowledged having had conversations about the case, based on what she had read and heard about it.

[54] Howlett was asked if Bushard was asked about her guilt. In response, she said:

> There was a conversation that was held one night, and she mentioned—she mentioned how—the way they planned it is what she said. We [Howlett and Wright] asked her if she knew what she was saying as far as saying the way they planned it. And she said, well, yeah.
> And Kathy said, well, Anna, you're saying that you're guilty. And Anna says—she just shook her head, didn't say anything else.

peated three times during closing arguments:

> Do you know you're saying you're guilty?
> You're saying you're guilty.
> You're saying you're guilty.

Clearly, the prosecutor regarded the accusation as having probative value in and of itself, but nevertheless he did not inform the jury that he had granted Wright a concession regarding the length of her punishment.

Since Bushard's lawyer did not object to the recital of Wright's assertion regarding Bushard's complicity, the legal issue whether Wright's assertion was admissible has not been explored. On the remand that I would order, this issue could be explored and briefed.

C

The prosecutor referred to Howlett's testimony that "the way they planned it, it was supposed to have happened on a Wednesday, but it happened on a Thursday." The prosecutor argued that Bushard knew about the call on Wednesday "because she was told to expect that call. She was told it was going down Wednesday or Thursday."

There is no evidence, however, that Anna Bushard was told it was "going down" Wednesday or Thursday. Peggy Stevens denied that she so informed her mother. The prosecutor, who had introduced a record of phone calls, surmised that during one of several telephone conversations on Tuesday night, Peggy said, "Mom, it's going down Wednesday or Thursday." This was surmise and speculation and contrary to Peggy Stevens' denial that she had so informed her mother. It is again noteworthy that disbelief of a witness' testimony does not constitute affirmative evidence to the contrary. The prosecutor thus made a statement, "Mom, it's going down Wednesday or Thursday," that is contrary to the record.

The prosecutor continued "that that's supported by Rhonda Howlett?" In other words, Howlett confirmed that Peggy Stevens told Bushard on Tuesday that it was "going down" Wednesday or Thursday night. That is stringing together two unconnected statements, and misleading.

In all events, by January or February, 1986, when Bushard is claimed to have made the statement to Howlett indicating that the murder was originally planned for Wednesday and did not "go down" until Thursday, it should have been obvious to almost everyone that the original plan was to lure Fancher away and kill him on Wednesday, and that for whatever reason, either because the truck broke down or some other reason, Hill called Fancher and canceled the plans for Wednesday night and lured him away and killed him on Thursday.

One does not have to be the proverbial rocket scientist to conclude—from the evidence that the first phone call to Fancher was made Wednesday morning, on Wednesday night the plans were canceled and the plans were rescheduled for Thursday night, when Fancher was lured away and soon thereafter killed—that the original plan was to kill Fancher on Wednesday night, that it did not "go down" on Wednesday night, and that it "went down" on Thursday night.

Once again, the prosecutor sought to mislead, and may have misled, the jury by mischaracterizing the significance of evidence about which there could have been no dispute. By January, 1986, countless persons knew that the murder had been planned originally for Wednesday night and did not occur until Thursday night. The countless persons who knew this were not coconspirators. Neither was Bushard, unless she had become part of the conspiracy to kill Fancher, and had learned

this before Wednesday, or at some time thereafter, as a result of a conversation with Peggy. There is no evidence of any such conversation, and Peggy denied that there was such a conversation.

I would remand to the trial court for a *Ginther*-type hearing and would retain jurisdiction to consider, in light of such findings as the trial judge might deem appropriate, whether to order a new trial.

CAVANAGH, C.J., and MALLETT, J., concurred with LEVIN, J.

BRICKLEY, J. (*concurring in part and dissenting in part*). I write separately to express my opinion that the limitation of the cross-examination of Peggy Stevens regarding the alleged welfare fraud was an error of constitutional dimension. However, I do not believe that it warrants reversal of the defendant's conviction. Nor do I believe that this Court, sua sponte, should remand this case to the trial court for a *Ginther* hearing. *People v Ginther,* 390 Mich 436; 212 NW2d 922 (1973). Thus, I concur with Justice BOYLE that the defendant's conviction should be affirmed.

The defendant had the constitutional right to cross-examine Peggy Stevens and to inquire into her truthfulness and credibility. As the United States Supreme Court stated in *Davis v Alaska,* 415 US 308, 316; 94 S Ct 1105; 39 L Ed 2d 347 (1974):

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. . . . A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to

issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony."

Exploration of the allegation that Stevens had previously engaged in welfare fraud and had involved the defendant in that fraud could have aided the defense in its attempts to show that Stevens not only was a dishonest person, but also was willing to implicate her mother in a crime. Thus, I agree that the evidence should have been admitted, and the fact that it was not infringed upon the defendant's constitutional right of confrontation.

The lead opinion states that "[w]here the error is not of constitutional dimension, the inquiry is whether the defendant's conviction constituted a miscarriage of justice." *Ante,* p 391, n 7. Because I believe that the error is of constitutional dimension, I believe that the proper test is stated in the Court of Appeals opinion in *People v Catey,* 135 Mich App 714; 356 NW2d 241 (1984). In the absence of preservation, if a constitutional question regarding the admissability of evidence is raised, we must determine whether it is decisive of the outcome of the case. See *id.; People v Banning,* 329 Mich 1; 44 NW2d 841 (1950).

I do not believe that the failure to allow this cross-examination was decisive of the outcome. The jury already knew that Peggy Stevens was receiving complete immunity for her testimony. This showed that Stevens had a motive to fabricate and that she was biased. It heard her admission that she participated in the planning of a murder. However, it still chose to believe her testimony that the defendant was a part of the conspiracy to kill the decedent. Thus, I do not

believe that the failure to allow cross-examination regarding the alleged welfare fraud warrants reversal of the defendant's conviction.

As for the question whether Stevens' testimony about what Tony Hill said to the decedent before killing him fell under the coconspirator exception to the hearsay rule, I agree with Justice LEVIN that this issue was not properly preserved at trial, and I find that review of it is unwarranted.

I would affirm the defendant's conviction.

RILEY, J., concurred with BRICKLEY, J.