# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ROBERT JAMES CARTER,

Defendant-Appellant.

UNPUBLISHED
February 20, 2018

No. 336265
Wayne Circuit Court
LC No. 16-001900-01-FC

Before: SAWYER, P.J., and MURRAY and STEPHENS, JJ.

PER CURIAM.

Defendant was convicted by a jury of first-degree murder, MCL 750.316; armed robbery, MCL 750.529; and possession of a firearm during the commission of a felony (felony firearm), MCL 750.227b. He was sentenced to life in prison without parole for the first-degree murder conviction, a term of 20-40 years' imprisonment for the armed robbery conviction, and the mandatory two-year consecutive term of imprisonment for the felony firearm conviction. Defendant appeals as of right. We affirm.

## I. FACTUAL BACKGROUND

Defendant and Drakile Jones, were convicted in separate jury trials of robbing and murdering Phillip Pentecost.[1] Around midnight on January 26, 2016, defendant and Jones went to the home of Justin Harris, with whom Jones had spoken earlier in the day about getting together. Shortly before arriving at Harris's house, Jones called him and inquired about "hitting licks" (which meant getting some money) and also about whether Harris had a "stick" (meaning a gun). Jones informed Harris that he had a friend with him (defendant), and when Harris indicated he was not interested in meeting anyone at that time, Jones reassured Harris that he need not worry because defendant was so loyal to Jones that "he would blow [Harris] if [Jones] told him to," meaning he would "shoot" or "kill" Harris. Harris did not take this as a threat, but rather as Jones vouching for defendant's loyalty.

---

[1] Jones was tried by a separate jury some months before defendant's trial and his appeal, Docket No. 334635, has been submitted jointly with defendant's appeal.

Jones subsequently arrived at Harris's home with defendant. Harris was there with a cousin and a friend. Jones discussed "hitting licks" with Harris and again asked whether Harris had a "burner" (a gun). Defendant stood nearby but did not participate in the discussion. Defendant was armed with a handgun. Eventually, Jones and defendant left the house. Harris testified that Pentecost's car, a black Chevrolet HHR, was parked in a driveway two houses away with the engine running; Harris could not determine if Pentecost was inside the car.

Harris went back inside, but shortly afterwards he heard a gunshot, a scream, and then another gunshot. He then saw Pentecost's car speeding away and went outside to find Pentecost lying on the ground bleeding from his head. Harris called 911, got a towel to hold to Pentecost's head, and stayed with him until the police and ambulance arrived. Harris found an iPhone next to Pentecost, which he assumed belonged to Pentecost. He picked it up, but the police took it from him and later determined that it was defendant's cell phone. Harris testified that shortly after he went back inside his home, he spoke on the telephone with Jones who told him not to admit to the police that he had seen Jones. Harris was interviewed by the police and did not initially mention defendant or Jones. However, in later interviews he admitted that defendant and Jones had been present at his home, and also told them about Jones's call.

An autopsy determined that Pentecost had been shot twice: once in the abdomen and once in the head. Either shot would have been fatal.

Tavion Williams[2] testified that defendant came to his house and asked for his help in hiding a black Chevrolet. Williams and defendant drove the vehicle around the block and parked it behind a store. The following morning, defendant told Williams about the robbery and shooting. Defendant left at Williams' request. Defendant returned that night and asked Williams to help dispose of the black Chevrolet; Williams refused and defendant left.

Subsequently, the fire department discovered a black Chevrolet HHR on fire behind an abandoned house. It was determined that the fire had started in the passenger compartment; a hidden vehicle identification number revealed the vehicle's owner and it was determined that there was a "hold for homicide" notification associated with the vehicle.

Eventually, a search was conducted of defendant's apartment. The police discovered a leather jacket that had belonged to Pentecost. The police also used tracking software to follow where defendant's and Jones's cell phones had been during the time immediately before the murder and for the day after the murder. Defendant was interviewed by the police and gave several inconsistent versions of what happened during the robbery and murder. Eventually he blamed the events on Jones, claiming that Jones had forced him to participate in the robbery and then had shot Pentecost. Based on this claim, defendant subsequently offered a duress defense at trial. Defendant also admitted that he drove Pentecost's vehicle away from the scene and later disposed of it.

---

[2] Williams's first name was spelled Taevion in Jones's trial.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant first claims that his trial counsel failed to provide effective assistance of counsel as required by the Sixth Amendment because he failed to present Tavion Williams as a witness. Williams had testified in Jones's trial about his interaction with defendant shortly after the murder, and defendant argues that this testimony would have assisted him in getting the jury to accept his duress defense. This claim is without merit.

Defendant failed to preserve this issue by moving for a new trial or an evidentiary hearing in the trial court. *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009). This Court's review is therefore limited to the existing record. *People v Cox*, 268 Mich App 440, 453; 709 NW2d 152 (2005). Whether defendant received the effective assistance of counsel is a mixed question of fact and law. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). This Court reviews the trial court's findings of fact for clear error and reviews questions of constitutional law de novo. *Trakhtenberg*, 493 Mich at 47.

To establish ineffective assistance of counsel, a defendant must show that his counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and that a reasonable probability exists that, without counsel's unprofessional errors, the outcome of the proceedings would have been different. *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Pickens*, 446 Mich 298, 303; 521 NW2d 797 (1994). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694.

As this Court observed in *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012):

> This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight. *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008).

> * * *

> Decisions regarding whether to call or question witnesses are presumed to be matters of trial strategy. *People v Rocky*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999). "[T]he failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense." *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004).

In *Russell*, this Court found that the trial court abused its discretion in granting a new trial based on the trial counsel's failure to present a witness. This Court noted that the witness's testimony was contradictory and would likely not have benefitted the defendant. Furthermore, this Court concluded that even if the trial counsel's failure to investigate and call the witness was deemed an error that fell below an objective standard of reasonableness, the defendant had still failed to show that his counsel's decision had prejudiced him. Counsel had argued that the incident was an accident, it was unclear that the witness's testimony would have assisted the

defense since it was contradictory, and defendant was not denied a substantial defense by the absence of the witness's testimony. *Russell*, 297 Mich App at 718.

After the prosecution rested, defendant's trial counsel specifically stated that she was making a strategic decision not to present Williams as a witness. Williams's testimony was mostly inculpatory with respect to defendant and only minimally exculpatory. Williams testified in Jones's trial that he knew both defendant and Jones. He stated that he received a telephone call from defendant on January 27 or 28, 2016, at around 2:00 or 3:00 a.m.; he recognized his voice and he also saw defendant's name appear on the screen. Defendant sounded scared or frantic and said he needed somewhere to go and asked if he could come to Williams's home. When defendant arrived, he called Williams and asked him to come outside; Williams found defendant seated alone in a black Chevy. Defendant told Williams he needed somewhere to put the vehicle, and Williams told him he could put it around the corner. Together they drove the car about two blocks away, parked it behind a store, and then walked back to Williams's house and went to sleep. When they awoke the next morning, defendant told Williams that he had participated in a robbery and someone had been shot. Williams specifically testified: "[Defendant] told me that him and [Jones] was on the west side, and they were looking to make some money." Williams further testified that defendant told him that he and Jones were looking to rob someone and found someone to rob. According to Williams, defendant chose whom to rob. Williams also testified that defendant and Jones argued over whether it was a good idea to go through with the robbery, and according to defendant, Jones threatened to turn the gun against him if he did not participate. Defendant finally told Williams that they went to the car, Jones shot the man, and defendant left the scene in the man's car. Williams denied that defendant had ever told him a third person was involved in the robbery. Further, Williams agreed that defendant had previously sent him photographs of a firearm that were posted on Facebook. He explained to Williams that "his Dad had some guns, and he was going to take them."

Williams testified that he told defendant he had to leave and defendant did so. Later that evening, defendant came back and asked if Williams would help him burn the black Chevy. Williams refused and again told defendant to leave.

Although this testimony provided some support for defendant's claim that he acted under duress because of Jones's threat, it also provided inculpatory evidence that defendant actively planned a robbery with Jones, including selecting the victim, and acted on his own to drive the victim's car away, conceal it, and later return looking for assistance in burning that vehicle. Williams's testimony also linked defendant to the possession of two guns, established that defendant had a Facebook photo with a gun, and contradicted defendant's claim that a third person was involved in the robbery. Moreover, defendant testified in his own behalf and claimed that he was forced by Jones to participate in the robbery. Therefore, he was able to present a duress defense. Given the, at best, contradictory testimony of Williams, as well as the other evidence presented by the prosecution, it is not probable that a different result would have occurred had Williams's testimony been presented at defendant's trial. Moreover, trial counsel was aware of Williams's testimony because it had already been offered at Jones's trial. It was therefore clearly a matter of trial strategy to determine that it was best not to present that testimony and instead to attempt to establish the duress defense through defendant's own testimony, and this Court does not second-guess such strategic decisions. *Russell*, 297 Mich App

at 716. Defendant has therefore failed to carry his heavy burden of showing that his trial counsel failed to provide effective assistance.

### III. WITNESS PRODUCTION AND DUE DILIGENCE

Defendant next claims that the prosecution failed to demonstrate due diligence in attempting to produce witness Anthony Cox-Rogers, and that the trial court therefore abused its discretion by ruling that the prosecutor could use Cox-Rogers's preliminary examination testimony. This claim is meritless.

A trial court's determination of due diligence is reviewed on appeal for an abuse of discretion. *People v Bean*, 457 Mich 677, 684; 580 NW2d 390 (1998). "A defendant has the right to be confronted with the witnesses against him or her." *People v Yost*, 278 Mich App 341, 369; 278 NW2d 753 (2008), citing US Const, Am VI; Const 1963, art 1, § 20; and *Crawford v Washington*, 541 US 36, 42; 124 S Ct 1354; 158 L Ed 2d 177 (2004). "The Sixth Amendment bars testimonial statements by a witness who does not appear at trial unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness." *Yost*, 278 Mich App at 370, citing *Crawford*, 541 US at 53-54. Defendant claims his constitutional right to confrontation was denied because the prosecution failed to produce Cox-Rogers at trial or to show due diligence in attempting to locate and produce him.

MRE 804(a)(5) provides, in relevant part:

**(a) Definition of Unavailability.** "Unavailability as a witness" includes situations in which the declarant –

\* \* \*

(5) is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means, and in a criminal case, due diligence is shown.

"The test is one of reasonableness and depends on the facts and circumstances of each case, i.e., whether diligent good-faith efforts were made to procure the testimony, not whether more stringent efforts would have produced it." *Bean*, 457 Mich at 684.

Cox-Rogers testified at the preliminary examination and was cross-examined by defense counsel as well as Jones's counsel. He appeared on the first day of trial and was told to return on October 17, 2016. Arrangements were made for him to be picked up by a taxi cab; however, on the morning of October 17th he apparently called the cab company and told them he was not going to court. The prosecutor requested a material witness warrant pursuant to MCL 767.35, and the court ordered that the witness was to "be picked up and brought before the Court immediately."

Two days later, the prosecutor reported that efforts to locate Cox-Rogers had been unsuccessful and asked to be allowed, pursuant to MRE 804(b)(1), to use his preliminary examination testimony. Defendant's counsel then asked that the officer-in-charge detail the

-5-

steps that had been taken to secure Cox-Rogers's presence. Officer Michael Crosby then testified that he had been given a witness detainer for Cox-Rogers on October 17th. At one point he made contact with defendant's sister, who told him that Cox-Rogers had just left. He gave information regarding Cox-Rogers, including the address he had for Cox-Rogers and information concerning his place of employment, to the Headquarters Surveillance Unit, which began surveillance of the witness's home, aided by a unit from the Ninth Precinct's Special Operations Unit. Crosby also checked the Wayne County and Macomb County jails. He did not check any hospitals. Crosby testified that Cox-Rogers was not in any morgue.

Noting that Cox-Rogers had appeared on the first day of trial, the trial court ruled that Cox-Rogers was unavailable:

> Yes, I think that is true. So certainly he knew he had to be here because he was here [on the first day of trial]. And [the prosecutor] indicated as an officer of the court, he had instructed Mr. Cox-Rogers that he had to be back. He didn't and specifically told the cab driver who had come to pick him up that he wasn't coming.
>
> Surveillance on his residence, surveillance on his place of work have been fruitless. Sibling has indicated that he had just left. I think a reasonable conclusion to be drawn in light of the fact that he's not in the Wayne County Jail or Macomb County Jail is that Mr. Cox-Rogers has decided to absent himself during the course of these proceedings.
>
> Michigan law requires that in term[s] of showing unavailability that there must be a showing that what was done was reasonable efforts made to find him.
>
> Surveillance efforts, going to his home to pick him up to actually deliver him here certainly was reasonable. I do think that an adequate record has been made, and certainly the only reasonable inference to draw at this particular point is that Mr. Cox-Rogers is, for want of a better term, laying low until all this is over, and I will allow his Preliminary Examination testimony to be read to the jury. Okay.

Defendant has failed to show an abuse of the trial court's discretion. On appeal, he claims that the police failed to determine what restaurant Cox-Rogers worked at, but Crosby testified that he provided the surveillance team "the location of his employment at Apple Bee's [sic] in Sterling Heights, and they took that information and gathered more to find out where that actual Apple Bee's [sic] was." Moreover the testimony indicates that surveillance was conducted on the restaurant without success.

Defendant also claims that the surveillance of Cox-Rogers's home was "ineffectual" because the police learned he had "just left" and that if the trial court had excluded Cox-Rogers's preliminary examination testimony, the police would have made more diligent efforts to locate him. Due diligence does not guarantee that every effort undertaken by the police will be successful. Both our Supreme Court and this Court have repeatedly stated that "due diligence" means "doing everything reasonable, not everything possible." *People v Travis*, 443 Mich 668,

692; 505 NW2d 563 (1993); *People v Eccles*, 260 Mich App 379, 391; 677 NW2d 76 (2004). Again, the test is not whether more stringent efforts would have resulted in locating the witness, but whether the efforts that were made were reasonable and diligent. *Bean*, 457 Mich at 684. Notably, the trial court concluded that Cox-Rogers was "laying low" to avoid having to come to trial. We conclude that the police made reasonable good-faith efforts to locate Cox-Rogers, and that the trial court did not abuse its discretion in determining that the prosecution had demonstrated due diligence and that it was proper for the prosecutor to present Cox-Rogers's prior testimony from the preliminary examination.

## IV. COCONSPIRATOR EXCEPTION TO HEARSAY

Defendant next claims that admission of a hearsay statement from Harris was improper and that it did not qualify as a statement by a conspirator in furtherance of the conspiracy. We disagree.

At trial, defendant specifically objected to Harris's testimony relating the statement by Jones vouching for defendant's loyalty. Harris testified: "He told me that basically he was good, and you know what I'm saying in so many words if I told him to blow you, he will blow you. He would shoot you, in other words."

MRE 801(d)(2(E) provides (in relevant part):

**(d) Statements Which Are Not Hearsay.** A statement is not hearsay if –

(2) *Admission by Party-Opponent*.

(E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy on independent proof of the conspiracy.

In *People v Martin*, 271 Mich App 280, 316-317; 721 NW2d 815 (2006), aff'd 482 Mich 851 (2008), this Court summarized the relevant law:

> The proponent of evidence bears the burden of establishing its relevance and admissibility. *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 781; 685 NW2d 391 (2004). In order to qualify under the exclusion for statements by a coconspirator, the proponent of the statements must establish three things. First, the proponent must establish by a preponderance of the evidence that a conspiracy existed through independent evidence. *People v Vega*, 413 Mich 773, 780; 321 NW2d 675 (1982). A conspiracy exists where two or more persons combine with the intent to accomplish an illegal objective. *People v Blume*, 443 Mich 476, 481-482; 505 NW2d 843 (1993). It is not necessary to offer direct proof of the conspiracy. *People v Justice (After Remand)*, 454 Mich 334, 347; 562 NW2d 652 (1997). Instead, it is "sufficient if the circumstances, acts, and conduct of the parties establish an agreement in fact." *People v Atley*, 392 Mich 298, 311; 220 NW2d 465 (1974), overruled on other grounds by *People v Hardiman*, 466 Mich 417, 428 (2002). Circumstantial evidence and inference may be used to establish

the existence of the conspiracy. *People v Gay*, 149 Mich App 468, 471; 386 NW2d 556 (1986). Second, the proponent must establish that the statement was made during the course of the conspiracy. *People v Bushard*, 444 Mich 384, 394; 508 NW2d 745 (1993). The conspiracy continues "until the common enterprise has been fully completed, abandoned, or terminated." *Id*. Third, the proponent must establish that the statement furthered the conspiracy. *Id*. The requirement that the statement further the conspiracy has been construed broadly. *Id*. at 395. Although idle chatter will not satisfy this requirement, statements that prompt the listener, who need not be one of the conspirators, to respond in a way that promotes or facilitates the accomplishment of the illegal objective will suffice. *Id*.

The statement to which defendant specifically objected occurred during the course of a telephone conversation between Jones and Harris.[3] The following colloquy occurred between the prosecutor and Harris:

*Q*. So he asked about a gun, and he asked about hitting a lick; is that correct?

*A*. Yes.

*Q*. Did he say that he was alone or with someone?

*A*. He said he was with someone.

*Q*. When he said he was with someone, did that cause you to be concerned at all?

*A*. A little bit, yes.

*Q*. Why?

*A*. Because I expressed that I didn't like new people around or know where I stayed at the time.

*Q*. Did he vouch for that individual in any way?

*A*. Yes.

*Q*. What did he say to you?

_____

[3] When defendant made his objection, Harris had not yet testified in his trial. However, Harris had previously testified in Jones's trial. With respect to this issue, we are referring to Harris's testimony at Jones's trial for the purpose of showing exactly what defendant was objecting to at the time he lodged his objection.

*A.* He told me that basically he was good, and, you know, what I'm saying in so many words if I told him to blow you, he'll blow you. He would shoot you, in other words.

*Q.* Let me understand. The defendant was talking to you on the phone?

*A.* Yes.

*Q.* He was talking about the person who was with him?

*A.* Yes.

*Q.* And says if I tell him to blow you?

*A.* Yes.

*Q.* He'll blow you?

*A.* Yes.

*Q.* You took that to mean if I tell him to shoot you, he'll shoot you?

*A.* Yes.

*Q.* Did that cause you to be more concerned or less concerned?

*A.* I was more or less or more concerned because he was really expressing[,] [it] sounded like he was expressing it to me as how much, how loyal his friend was to him, how cool he was to him. So that's what he was saying that he was cool, but that's what he said, you know.

*Q.* So you took that as an expression of the loyalty of his friend rather than a threat to you?

*A.* Correct.

Harris subsequently testified that Jones and defendant arrived at his house, that he spoke with Jones about "hitting licks," and that Jones was not armed but he saw the butt of a gun sticking out of defendant's hoodie pocket. Harris's testimony at defendant's trial covered substantially the same material.

The conspiracy that the prosecution had to prove was a conspiracy to commit armed robbery. This required a showing, by a preponderance of the evidence, that defendant and Jones assaulted someone with a dangerous weapon with the intent to permanently deprive that individual of his money or property. MCL 750.529 and MCL 750.530. The focus of the statute is on the assault, and while the intent is to take money or property, it is not necessary that money or property actually be obtained. *People v Williams*, 491 Mich 164; 814 NW2d 270 (2012).

The evidence established that defendant had met with Jones and that when he did so he was carrying a loaded revolver. Jones talked about robbing people. Pentecost was assaulted and murdered with a .38 revolver; the gun defendant possessed was a revolver. Defendant stole Pentecost's car and, subsequently, his leather jacket. The day after the shooting, defendant, in association with Jones, burned Pentecost's vehicle. By a preponderance of the evidence, these facts – without the admission of Jones's statement about defendant's loyalty – established, at least by inference and circumstantial evidence, that defendant conspired with Jones to rob someone. Given that defendant was present with Jones when Jones called Harris to discuss "hitting a lick," and subsequently came to Harris's house armed with a revolver and proceeded to do just that, by inference it appears that Jones's statement vouching for defendant's loyalty was made during the course of the conspiracy to commit an armed robbery. Finally, broadly construed, Jones's statement vouching for defendant's loyalty advanced the conspiracy because it induced Harris to allow Jones and defendant to come over to his house where Jones and defendant found Pentecost and where, according to defendant's statements, Harris indicated that they could get money from Pentecost. This evidence was sufficient to establish the existence of a conspiracy at the time Jones made his statement vouching for defendant's loyalty. Accordingly, the trial court did not abuse its discretion in admitting the evidence.

Regardless, we cannot conclude that the admission of Jones's statement, even if improper, was outcome determinative. The particular statement to which defendant objected was simply Jones's vouching for defendant's loyalty, a matter which defendant's own testimony subsequently established.[4] Defendant's guilt was established by the other evidence showing his possession of the loaded revolver and his participation in the crimes and the subsequent cover-up, not by Harris's testimony concerning a statement by Jones vouching for defendant's loyalty. Therefore, "in light of the weight and strength of the untainted evidence," *Musser*, 494 Mich at 348, this Court concludes that any error caused by the admission of Jones's statement through Harris's testimony would not have been outcome determinative.

## V. COMPELLED PRODUCTION OF EVIDENCE

Defendant finally argues that the trial court erred in ruling that the police could properly compel defendant to surrender the passcode for his iPhone, which enabled the police to obtain call data and photographs from the cell phone's internal storage. It is apparent to this Court that defendant has misunderstood the trial court's ruling, and that therefore the issue raised by defendant on appeal is meritless because it has already been decided in his favor by the trial court. Contrary to defendant's claim on appeal, the trial court did not rule that the passcode for the cell phone was non-testimonial information that did not violate defendant's Fifth Amendment right against compelled self-incrimination; in fact, the trial court agreed that asking for the

---

[4] Defendant also made statements to the police that showed that he participated in the armed robbery of Pentecost. Although defendant attempted to minimize his involvement and also attempted to claim that Jones coerced him into participating, the prosecution did not have to disprove defendant's theory of the case in order to sufficiently prove the existence of a conspiracy.

passcode was *not* a routine "booking question" and that the police questioning and defendant's answer violated *Miranda*. However, the trial court ruled that the police would have inevitably obtained access to defendant's cell phone because they could have obtained a search warrant for his fingerprint to unlock the phone and therefore, the data and photographs were admissible based on the inevitable discovery exception to the exclusionary rule.

We note that there is a Fourth Amendment concern that is triggered by searches of cell phones conducted without either the owner's consent or a search warrant. This concern is not presented by defendant's argument. Instead, defendant addresses only the Fifth Amendment concern that asking for the passcode of his cell phone constituted testimonial compulsion.

Preliminarily, the parties, and the trial court, all *agreed* that asking defendant for the pass code to his cell phone was *not* a "booking-type" inquiry. Therefore, contrary to defendant's position and argument on appeal, the trial court *agreed* that police questioning asking for defendant's cell phone passcode, and defendant's act of providing the passcode, *did not* amount to routine booking information requests or responses, and the trial court accordingly *suppressed* defendant's response for use in the prosecution's case-in-chief. However, the trial court also ruled that despite the access that the police gained to defendant's cell phone because he provided them his passcode, the data and photographs that were obtained as a result would not be suppressed because they would have been inevitably discovered when the police obtained a search warrant for the cell phone's contents and forced defendant to provide his fingerprint to unlock the cell phone. Defendant argues on appeal, "it may have been that if the Defendant had not given his passcode without Miranda warnings, the court might have been able to compel him to use his fingerprint--but that is not the issue before this Court." But contrary to defendant's claim, that is the *only* issue that could be before this Court, and it is not an issue that defendant has raised. Instead, defendant has raised only an issue upon which he *prevailed* in the trial court, and has specifically told this Court it need *not* address the *only* issue the trial court ruled upon unfavorably to the defense.

This Court will ordinarily not address a claim that a defendant has failed to present, argue, or support with pertinent authority. *People v Harris*, 261 Mich App 44, 50; 680 NW2d 17 (2004). Defendant has insisted that this Court *need not review* – and he has not addressed – the trial court's ultimate ruling: that because defendant could have been properly compelled to provide his fingerprint to unlock his cell phone, the police would have inevitably discovered the cell phone's data and photographs. Because defendant has not raised this issue, and has instead explicitly stated that this Court need not review this issue, this Court concludes that there is no reason for this Court to independently review this issue. We conclude that defendant has abandoned any claim with respect to the admission of the evidence found on defendant's cell phone.

Affirmed.

/s/ David H. Sawyer
/s/ Christopher M. Murray
/s/ Cynthia Diane Stephens